UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– against –

R.V.,

Defendant.

**14-CR-0316**

Statement of Reasons for
Sentencing Pursuant to 18 U.S.C. §
3553(c)(2)

**Appearances**

**For United States:**

Peter W. Baldwin
United States Attorney's Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201
718-254-7000
peter.baldwin@usdoj.gov

**For Defendant:**

Len H. Kamdang
Federal Defenders of New York Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
718-407-7414
len_kamdang@fd.org

**JACK B. WEINSTEIN, Senior United States District Judge:**

## Table of Contents

I.   INTRODUCTION ............................................................................................. 1
     A.   Varying Degrees of Culpability of Child Pornography Offenders ..................... 1
     B.   Consistency in Sentencing ............................................................................. 5
     C.   Defendant in Instant Case ............................................................................ 6
II.  FACTS AND PROCEDURAL HISTORY ..................................................... 6
     A.   Background .................................................................................................... 7
     B.   Sexual History ............................................................................................... 9
     C.   Child Pornography ........................................................................................ 9
     D.   Arrest ......................................................................................................... 10
     E.   Mental Health Treatment ............................................................................ 11
     F.   Administration for Children Services ......................................................... 13
     G.   Guilty Plea .................................................................................................. 13
III. EXPERTS .................................................................................................... 14
     A.   Medical ....................................................................................................... 14
         1.   Credentials ........................................................................................ 15
         2.   Methodology and Diagnosis ............................................................... 16
         3.   Findings ............................................................................................. 17
             a.   Transition to Child Pornography ............................................... 17
             b.   No Physical Threat to Children ................................................. 22
             c.   Recidivism Risk ....................................................................... 23
         4.   Recommendation for Sentence ........................................................... 24
     B.   Social Worker ............................................................................................. 26
     C.   Family ......................................................................................................... 28
IV. SENTENCE IMPOSED ............................................................................... 28
V.  SENTENCING CONTEXT .......................................................................... 29
     A.   Shifting Societal Norms .............................................................................. 29
     B.   Changing Technological Landscape ............................................................ 31
         1.   Personal Computer Revolution ........................................................... 31
         2.   Internet Revolution ............................................................................ 32
             a.   Broadband Revolution .............................................................. 35
             b.   Rise of Mobile Connectivity ..................................................... 36
             c.   Rise of Social Media ................................................................. 38
             d.   Emergence of the Cloud ............................................................ 38
     C.   How Internet Revolution Enabled Child Pornography Consumption ............. 39
     D.   Connection between Child Pornography Consumers and Child Molesters ...... 48
     E.   Child Pornography's Continued Harm to Children ......................................... 55
     F.   Effects of Excessive Punishment on Defendants and Families ...................... 56
VI. SENTENCING LAW ................................................................................... 67
     A.   Discretion of Sentencing Judge in Determining Appropriate Punishment ....... 67
     B.   Applicable Statute ....................................................................................... 67

    C.    Advisory Nature of the Sentencing Guidelines ................................... 68
        1.   Section 3553(a) Factors ................................................................. 68
        2.   Departures Based on Section 3553(b)(2) Factors ......................... 70
        3.   Departures Based on Disagreement with Commission Policy ...... 71
        4.   Departures:  Statement of Reasons Required ............................... 72
    D.    Restitution ..................................................................................... 72
VII. APPLICATION OF LAW TO FACTS .......................................................... 75
    A.    Guidelines Sentencing Range ...................................................... 75
    B.    Analysis of Section 3553(a) Factors ............................................ 76
        1.   Nature and Circumstances of Offense; History and Characteristics of
            Defendant ....................................................................................... 76
        2.   Purposes of Sentencing ................................................................. 77
        3.   Kinds of Sentences Available ...................................................... 82
        4.   Guidelines, Policy, and Other Criteria of Sentencing Commission ............. 82
        5.   Unwarranted Sentence Disparities................................................ 85
            a.   Increased below-Guidelines sentences in non-production cases........ 85
            b.   Increased non-prison sentences in possession-only cases.................. 91
        6.   Restitution...................................................................................... 92
    C.    Policy Considerations ................................................................... 93
VIII.  CONCLUSION .......................................................................................... 97

# I. Introduction

## A. Varying Degrees of Culpability of Child Pornography Offenders

This adult defendant viewed child pornography in his home on his computer. He also participated in electronic "chat room" sexual conversations with minor females. His sentencing demands consideration of the manifold relevant differences among child pornography offenders.

Under the federal criminal code, child pornography viewing through computers is a serious felony. The theory is that (1) computer depiction of children being sexually exploited creates a permanent widespread record of abuse, perpetuating and potentially exacerbating the harm initially suffered by the victim in the production, and (2) acquisition of these images encourages abuse of children in their production since viewers create demand.

Prosecution under the current sentencing framework has largely failed to distinguish among child pornography offenders with differing levels of culpability and danger to the community. The applicable structure does not adequately balance the need to protect the public, and juveniles in particular, against the need to avoid excessive punishment, with resulting unnecessary cost to defendants' families and the community, and the needless destruction of defendants' lives.

One of the foundational rules of our criminal justice system is that punishment should be commensurate with the crime—its threat to society. The need to tailor sentences to the dangers and needs of the individual being sentenced (and his family and community) are also foundational. Proportionality in sentencing encourages a fair system. Increasingly, judges, prosecutors, advocates and concerned citizens have recognized that the current sentencing approach to child pornography offenders is often unfair, unreasonable, cruel, and conceptually deficient.

Child pornography offenders can be broadly divided into two main categories: those who produce child pornography and those who are viewers of child pornography. By definition, producers of child pornography are child molesters, frequently representing the worst and most dangerous type of offender. Non-production offenders, by contrast, encompass a wide range of individuals with varying degrees of culpability. They include occasional viewers with no particular sexual interest in children as compared to adults; viewers with pedophilic tendencies who are aroused by images of minors but do not possess the intent or capacity to engage in any sexual contact with a minor; users of peer-to-peer files who passively and unintentionally distribute child pornography received on their computers; viewers who intentionally engage in the trafficking of child pornography for economic or psychic gain; and viewers who have, intend to, or are likely to, engage in sexual contact with a minor—*i.e.*, actual or potential child molesters.

Child pornography viewing is played out against a primal parental fear of pedophiles harming their children. While there is a degree of overlap between child pornography viewers and child molesters, most non-production child pornography offenders—and particularly the one now before the court for sentencing—show no *mens rea* suggesting the likelihood of future harm to children.

The Internet revolution has vastly increased the availability and accessibility of child pornography online, greatly expanding the category of people arrested for possession and distribution offenses involving explicit sexual images of minors obtained through home computers using various peer-to peer file sharing programs. As a result there has been an enormous increase in this criminal class, governmental resources used to ferret out its members, criminal prosecutions, and incarcerations.

Prosecutions and sentencing should differentiate among offenders' varying degrees of culpability. Failure to distinguish among the multitude of vectors involved in a sentencing decision is particularly grave in the field of child pornography offenses. To be adjudicated guilty necessarily results in denomination as a sex offender; automatically provided is a lifetime of continuous punishment—being marked as a pariah with severe restrictions on residence, movements, activities and associations. Adding unnecessary, unduly long, periods of incarceration is inappropriate and it should be avoided.

In order to deliver reasonable sentences for child pornography offenses, a detailed re-categorization and typology of offenders is warranted. The divisions below offer a tentative illustration of one possible taxonomy. Each category implies different mental states, which need to be considered when tailoring appropriate punishment and measures for control.

- **Possession-only child pornography users**: This category includes those viewers and consumers of child pornography who *download* images of child pornography. It frequently includes individuals with the lowest degree of culpability. Often, defendants in this category do not have the *mens rea* threatening actual contact with a minor.

- **Possession and involuntary distribution**: This category comprises those individuals who possess child pornography they downloaded and are deemed to have engaged in distribution due to the nature of the technology used for downloading the images. The individuals in this category *may not intend to distribute* child pornography. For example, this category would include child pornography users who download images via peer-to-peer file sharing sites which may render files automatically accessible to others.

- **Possession with intentional distribution**: This category comprises those individuals who *possess and intentionally distribute* child pornography to other users, but *not for*

3

*commercial gain*.  Offenders in this category display a higher degree of culpability; the trade and exchange of such images significantly contributes to the child pornography market, perpetuating the severe harm suffered by children in production.

- **Possession with intentional distribution for commercial gain**:  This category encompasses individuals who *profit from the trade in child pornography*.  This conduct is extremely serious.  It not only contributes to the existence of the market, but defendants in this category tend to be driven by unchecked pecuniary concerns rather than a mental illness amenable to curative medical treatment.

- **Online communications with minors without intent to engage in contact**:  This category includes those child pornography users who view child pornography while concurrently engaging in online communications with minors, without the intention, or with little or no likelihood, to engage in any physical contact with them.  The adverse effect on the child of such inappropriate conduct may be serious.

- **Online communications with minors intending to engage in contact**:  This category represents individuals with a high degree of culpability.  They possess the *mens rea* that is likely to lead to actual contact with minors.  Individuals falling within this category represent a serious risk to the public.  The contact ranges from talk to coitus.

- **Production of child pornography**:  Defendants in this category engaged in, and are most likely to engage in the future, in the sexual exploitation of a minor.  This group potentially constitutes a most serious and dangerous category of child pornography offenders.  Defendants in this category can be further differentiated based on factors such as the type of images produced, the quantity, and their role in the production.  Some involve

photographing rapes of young children by a parent and other relatives or friends of the family. Such incestuous relationships are particularly hard to ferret out.

While the current Guidelines for child pornography offenses appear to recognize most of these broad categories, several of the Commission's relevant sentencing enhancements tend to apply indiscriminately to all child pornography offenders, greatly increasing the recommended punishment range without necessarily reflecting an individual's heightened level of culpability. *See* U.S. Sentencing Comm'n, *Federal Child Pornography Offenses* (Dec. 2012), at 320-21 (recognizing that "[t]he current sentencing scheme . . . places a disproportionate emphasis on outmoded measures of culpability regarding offenders' collections," and recommending that the Guidelines be revised to "more fully account" for: the content of an offender's child pornography collection and nature of his collecting behavior; the degree of the offender's involvement with child pornography communities; and an offender's history of "sexually dangerous behavior.").

### B. Consistency in Sentencing

This court has been attempting to rationalize its own sentences by establishing general criteria for 'similar' cases, a project required by the wide discretion in sentencing afforded under *Booker*. *See United States v. Booker*, 543 U.S. 220 (2005); *United States v. Chin Chong*, 13-CR-570, 2014 WL 4773978 (E.D.N.Y. Sept. 24, 2014) (accounting for prospect of deportation when imposing a term of incarceration); *United States v. Sarpong*, 14-CR-242, 2014 WL 5363775, at *2 (E.D.N.Y. Oct. 21, 2014) (same); *United States v. Palaguachy*, 14-CR-0184, 2014 WL 6606668, at *2 (E.D.N.Y. Nov. 19, 2014) (same); *United States v. Florez Parra,* 14–CR–332, 2015 WL 105885, at *2 (E.D.N.Y. Jan. 7, 2015) (same); *see also United States v. Bannister*, 786 F. Supp. 2d 617, 688 (E.D.N.Y. 2011) (sentencing nine defendants together for internal consistency and reassurance to community); *United States v. C.R.*, 972 F. Supp. 2d 457, 459 (E.D.N.Y. 2013)

(problems with enforcing statutory minimums); *United States v. D.M.*, 942 F. Supp. 2d 327 (E.D.N.Y. 2013) (sentencing defendant who pled guilty to one count of possession of child pornography to five years' probation); *United States v. G.L.*, 305 F.R.D. 47 (E.D.N.Y. 2015) ("With the increase in sentencing discretion and concern over unnecessarily long incarcerations has come an increased need for each judge to try to avoid inconsistency in his or her own sentences. Stating reasons for sentencing in memoranda helps minimize both dangers.").

### C. Defendant in Instant Case

Defendant R.V., a loving father of two adult children and three school-age children, pled guilty to one count of a five-count indictment for possession of child pornography. Over a period of about one year, defendant downloaded child pornography in the privacy of his home without the knowledge of his wife or children. Defendant also engaged in video chats with minor females.

No evidence was presented of defendant ever having had inappropriate physical sexual contact with a minor. Expert testimony demonstrated that defendant poses no further danger to his or other children. In light of his children's and spouse's demonstrated need for his presence at home, imposed was a sentence of time-served of five days, and seven years of strict supervised release with medical treatment. Levied was: a fine of $12,500; $2,000 in victim's restitution; and a $100 special assessment.

## II. Facts and Procedural History

The parties stipulated that the defendant should be referred to as "R.V." to enhance rehabilitation and reduce adverse impact on the family. *See* Hr'g Tr., Apr. 30, 2015 ("Sent. Hr'g") at 27:17-28:1.

## A. Background

R.V., age 52, is a United States citizen and resident of Brooklyn, New York. Presentence Investigation Report, Oct. 17, 2014 ("PSR"), at 2.

Born in Puerto Rico, he grew up in humble circumstances. His father was a farmer; his mother, a homemaker. *Id*. at ¶ 39. Though most of his fourteen siblings were already grown up and living out of the home when R.V. was a child, he shares close relationships with his surviving eleven brothers and sisters who live in North Carolina. *Id*. at ¶ 40.

At age three or four, R.V. and his family immigrated to New York. Richard B. Krueger, Psychiatric and Risk Assessment ("Krueger Letter"), at 1. They relied on public assistance. *Id*. at 2. By ninth grade, R.V. had dropped out of school in order to work to help support the family. PSR at ¶ 52. When he was eighteen, defendant married his first wife; they divorced after one year. *Id*. at ¶ 41.

At age eighteen, defendant began to use marijuana. Krueger Letter at 2. He subsequently moved to cocaine and then to heroin. *Id*. He entered an inpatient treatment program, but relapsed. *Id*. at ¶ 51.

In 1991, at age 29, R.V. pled guilty to charges of attempting to sell cocaine. *Id*. at ¶¶ 31-32. He entered a drug treatment program and was released on parole. *Id*. at ¶ 51; Krueger Letter at 3. After a positive urine test for controlled substances, he was incarcerated for violation of parole, during which time he completed another drug treatment program. PSR at ¶ 51; Krueger Letter at 3. Following his release, R.V. was transferred to a Phoenix House inpatient treatment program for three months where he successfully completed another drug treatment program. PSR at ¶ 51. He reports that he has been sober since May 1, 1995; over 20 years. *Id*. at ¶ 50; Krueger Letter at 3.

In 2000, at age 38, the defendant married his current wife, then age 21. PSR at ¶ 9; Krueger Letter at 3. The couple subsequently had three children: a son (age 15), a daughter (age 12), and a daughter (age 10). PSR at ¶ 42. His son, after homeschooling, recently enrolled in public school; his two young daughters remain homeschooled by defendant's wife, who holds a college degree. *Id.*; Krueger Letter at 5. Defendant refers to his marriage as "great." Krueger Letter at 5. His wife describes him as a wonderful husband and father, who cooks for the family almost every night. PSR at ¶ 44.

Defendant also has two adult daughters (ages 24 and 26) from a previous unmarried relationship; they live in upstate New York. *Id.* at ¶ 43.

Following his arrest in the instant case, defendant was required to live separately from his family. *Id.* at ¶ 45; Krueger Letter at 3. He was permitted to return home after completion of an investigation by the New York Administration for Children Services ("ACS"). ACS found that none of R.V.'s children had been abused by him. PSR at ¶ 45.

Both of R.V.'s parents died from health-related problems. *Id.* at ¶ 39. Each of his surviving eleven siblings is gainfully employed and enjoys good health. *Id.* at ¶ 40. Each maintains a close relationship with R.V. and continues to remain supportive following his arrest. *Id.*

R.V. has worked in a variety of restaurants: as an assistant manager of a restaurant chain's warehouse; and, for the last five years, as a production manager of another restaurant chain, where he supervised approximately 20 people and earned some $75,000 a year. His employment was terminated upon his arrest in the instant case. *Id.* at ¶¶ 54-55; Krueger Letter at 1.

At the time of sentencing, he was employed by a bakery in Long Island City. Hr'g Tr., Apr. 1, 2015, at 16:20-17:2.

### B. Sexual History

Defendant's first "crush" occurred at age 15, on a 15-year-old female. Krueger Letter at 5. He went on his first "date" at age 18 with an 18-year-old female. *Id.* His first non-genital touching, or petting, occurred at age 19 with a 19-year-old female. *Id.* Defendant's first genital sexual encounter occurred at age 19 with the mother, also then 19 years old, of his oldest two children. *Id.*

R.V. has had three sexual partners—the mother of his oldest two children, his first wife, and his current wife. *Id.* He reported in a June 2014 medical interview that his last ten masturbatory fantasies involved adult women. *Id.* He reports that his sexual relationship with his current wife is satisfactory, but at times his wife is tired and not interested in sexual intercourse when he is. *Id.* at 3.

The defendant has viewed adult pornography intermittently for many years on his home computer in private, downloading and masturbating to such images. *Id.* at 3-4. For the year prior to his arrest, he viewed and masturbated to images and videos on his computer of girls aged 11 to 12 years old. PSR at ¶¶ 5-7.

### C. Child Pornography

Defendant admitted to agents from the Department of Homeland Security, who executed a search warrant of his home, that he used peer-to-peer electronic file-sharing software to search, obtain, and view child pornography. *Id.* at ¶ 7. After viewing the images or videos, he would either delete the files from his computer or he would move them to "free space" on his computer. *Id.*

He used peer-to-peer software to engage in video conversations with minor females using web applications "KiK" and "Ares." *Id.* at ¶ 8. In "chat rooms," he posed as a teenage boy between

9

the ages of 14 to 17 to engage girls in a "sexual manner." *Id.* He also admitted to occasionally watching and recording chat rooms in which minor females were performing sexual acts. *Id.*

On December 20, 2013, a Homeland Security Investigations agent, engaged in an ongoing investigation, connected to R.V.'s home computer. *Id.* at ¶ 5. The agent downloaded four files:

- a photograph depicting an adult male engaging in a sexual act with a five-year-old girl;

- a one minute and seventeen second video depicting an adult male engaging in a sexual act with a three-year-old girl;

- a twenty-four second video depicting two nude twelve-year-old girls touching an adult male's penis and each other; and

- a three minute and twenty-four second video depicting an adult male engaging in a sexual act with a prepubescent girl.

*Id.*

On May 1, 2014, agents from the Department of Homeland Security, executing a search warrant at R.V.'s home, located three separate thumb drives that defendant admitted belonged to him. *Id.* at ¶¶ 6-7. Most of the files found on the thumb drives were password protected, but agents were able to recover nine images and twenty-two videos depicting child pornography. *Id.*

**D. Arrest**

On May 2, 2014, R.V. was arrested for possession of child pornography. R.V.'s three youngest children and his wife were all residing at their home when he was arrested. *Id.* at ¶ 9. He was in jail for five days before he was released on bail. Order of Detention, May 2, 2014, ECF No. 3; Order Setting Conditions of Release, May 7, 2014, ECF No. 8 (sealed). Charged was that, on May 2, 2014, R.V. knowingly and intentionally possessed images of child pornography that

were mailed, shipped, or transported in interstate or foreign commerce. *See* 18 U.S.C. §§ 2252(a)(4)(B), 2252(b)(2).

### E.  Mental Health Treatment

After release on bail R.V. was treated by Mustard Seed Forensic Social Work Services ("Mustard Seed"), which provides sex offenders with treatments aimed at "the reduction of deviant sexual behavior and recidivism." Mustard Seed Forensic Licensed Clinical Social Work Services, P.C., http://www.mustardseedforensic.com/msmission.html. Since its inception, Mustard Seed has treated over 3,000 sex offenders. Mustard Seed Client Compliance Report, Ct. Ex. 2, April 1, 2015, at 1.

Provided to the court was a report by William C. Ford, a licensed clinical social worker and executive director and co-founder of Mustard Seed. *Id*.; Credentials of William C. Ford, Ct. Ex. 3, Apr. 1, 2015. Dr. Ford is a member of the National Association of Social Workers, and the Association for the Advancement of Social Work with Groups; a board member of Stop It Now!, a "national organization dedicated to ending child abuse;" and former member of the New York City Department of Probation's Domestic Violence and Sexual Assault Task Force. *Id*. During Ford's fifteen-year professional career, he has treated approximately 3,500 sex offenders. *Id*.

Dr. Ford spoke directly about R.V.'s participation in treatment and his potential for relapse. Recidivism was unlikely if adequate medical treatment was afforded:

> [R.V.] has been a willing and open participant in treatment thus far. He has played an active role in his own relapse prevention planning and has taken only assertive actions to address the steps he took to commit the instant offense. He has been willing to take an active role in his self-disclosure regarding all aspects of his sexual behavior. When asked what his expectation of treatment was he simply stated that he would like to develop the skills needed to remain relapse free and to no longer succumb to desires that would lead to him engaging in criminal or sexually deviant behavior.

Based upon his personal assessment regarding his motivation to participate in treatment, this immediate treatment goal was identified. [R.V.] would like to identify and correct the root causes of his involvement in the sexual offense.

We believe that [R.V.] has thus far benefited from his time in treatment. He has taken advantage of this opportunity to address his behavior and has become far more focused on his personal risk factors. Based on [R.V.'s] commitment to treatment and his ability to work on improving his recognition of his personal high risk factors *he appears capable [of] maintaining non-relapse behavior. The prognosis for non-recidivism, thus far, appears to be good.*

Mustard Seed Client Compliance Report, April 1, 2015, Ct. Ex. 2, at 3 (emphasis added).

Emphasized was that R.V. was actively engaging in treatment:

[R.V.] has engaged actively to improve his level of awareness and insight regarding the steps he took to engage in a sexually deviant act as well as to improve his recognition of his actions and to heighten his awareness of the impact of his actions. [R.V.] has begun to exhibit recognition as to how his actions may be perceived and he agrees with this perception. He openly identifies that his actions could cause long term damage to any female subjected to exploitation via child porn. He has since refrained from any behavior that may be perceived as criminal or harmful. . . .

[R.V.] presents himself as an easily approached and willingly engaged individual who has lived an active and vibrant life to date. He was easily engaged in discussions regarding the instant offense as well as all areas of his sexual life. Based upon his responses during sessions [R.V.] appears [to have] improve[d] his insight and judgment regarding what constitutes sexually deviant behavior as well as its impact on its victims. [R.V.] maintains that he does not currently, and has not since his arrest, engage[d] in sexually deviant behavior.

We remain convinced that early intervention with individuals involved in sexually inappropriate behavior at this level serves as an excellent deterrent to any progression of sexually deviant behavior and can result in long term relapse prevention as well as rehabilitation of the individual involved in treatment. Therefore *we believe that [R.V.], if given the chance to, can benefit from community based treatment to address his involvement in the commission of a sexually deviant act*.

*Id.* (emphasis added).

**F. Administration for Children Services**

After R.V.'s arrest, the Administration for Children Services ("ACS") of New York filed an Article 10 petition in the Kings County Family Court to protect his children; it opened an investigation into whether R.V. had abused them or posed a danger to them. *See* Sent. Mem., April 9, 2015, ECF No. 43 (sealed), at 1-2, Ex. A. ACS found no evidence of abuse; R.V. was permitted to return home to reside with his family on August 29, 2014. PSR at ¶ 11; Sent. Mem., April 9, 2015, ECF No. 43 (sealed), at 1, Ex. D; Hr'g Tr., Apr. 1, 2015, 94:18-20. The record from the Family Court was admitted in evidence under seal. *See* Sent. Mem., April 9, 2015, ECF No. 43 (sealed). There have been no reported violations; the petition was dismissed by the Family Court on May 6, 2015. Letter update as to [R.V.], June 10, 2015, ECF No. 51 (sealed).

Beginning with his initial release from custody on May 7, 2014 until sentencing on April 30, 2015, Pre–Trial Services closely monitored defendant. *See* Order Setting Conditions of Release, May 7, 2014, ECF No. 8 (sealed). The conditions of supervision included the following: defendant must remain within New York City; he must avoid areas where minors under the age of 18 tend to congregate, including but not limited to, parks, playgrounds, fast food restaurants near schools and arcades; he must undergo mental health evaluation and treatment as needed for the specific offense charged; and he must refrain from using a computer or accessing the Internet, except as may be necessary for employment purposes only. *Id.*

**G. Guilty Plea**

On August 26, 2014, the defendant appeared before a magistrate judge and pled guilty to one count of a five-count indictment. *See* Hr'g Tr., Aug. 26, 2014, ECF No. 29, at 23:22-24:2.

Specifically, defendant pled guilty to possession of child pornography in violation of 18 U.S.C. §

2252(a)(4)(B), which provides as follows:

> Any person who . . . knowingly possesses, or knowingly accesses
> with intent to view, 1 or more books, magazines, periodicals, films,
> video tapes, or other matter which contain any visual depiction that
> has been mailed or has been shipped or transported using any means
> or facility of interstate or foreign commerce . . . by any means
> including by computer if the producing of such visual depiction
> involves the use of a minor engaging in sexually explicit conduct
> and such visual depiction is of such conduct.

18 U.S.C. § 2252(a)(4)(B) (2012).  The maximum term of imprisonment for this crime is twenty

years.  *See* 18 U.S.C. § 2252(b)(2) (2012) (minors under 12 years old).  There is no minimum

sentence.

Defendant raised no constitutional or other challenge to the procedures by which the

evidence was obtained.  *See generally* Hr'g Tr., Aug. 26, 2014, ECF No. 29.  It was explained to

defendant that a mandatory supervised release term of five years was applicable.  *Id.* at 13:9-12.

He understood that he would be treated as a sexual offender under state and federal law with

serious adverse long term collateral consequences.  *Id*. at 18:25-19:7.

## III.  Experts

Evidentiary sentencing hearings were conducted on April 1 and April 30, 2015.  *See* ECF

Nos. 48-49.

### A.  Medical

Dr. Richard B. Krueger, a psychiatrist who specializes in paraphilic disorders, evaluated

the defendant in a four-hour interview on June 23, 2014.  Hr'g Tr., Apr. 1, 2015, at 38:16-41:23.

He took a detailed history of defendant's personal and family background, which included a stable

upbringing, some financial struggles, and substance abuse. *Id*. at 42:12-43:3, 44:18-45:4; *see generally* Krueger Letter.

Dr. Krueger wrote an expert report and testified twice. *See generally* Krueger Letter; Hr'g Tr., Apr. 1, 2015; Sent. Hr'g. He also reviewed a list of materials that this court advised it was considering in sentencing. *See* Order, April 29, 2015, ECF No. 46; Sent. Hr'g, at 15:19-21, 19:7-14. Dr. Krueger suggested that the court consider three additional sources: Martin P. Kafka, *Hypersexual Disorder: A Proposed Diagnosis of DSM-V*, 39 Archives of Sexual Behavior 377-400 (2010) (discussing the proposed revision of the DSM-V to include hypersexual disorder); Meg S. Kaplan & Richard B. Krueger, *Diagnosis, Assessment, and Treatment of Hypersexuality*, 47 Journal of Sex Research 181 (2010) (discussing the current standard for diagnosis, assessment, and treatment of hypersexual disorder); Richard B. Krueger, Meg S. Kaplan & Michael B. First, *Sexual and Other Axis I Diagnoses of 60 Males Arrested for Crimes Against Children Involving the Internet*, 14 CNS Spectrums 623 (2009) (discussing the newly suggested category of hypersexual disorder as the sexual diagnoses of 60 males arrested for possession of child pornography obtained via the Internet or attempting to meet a child over the Internet). Sent. Hr'g, at 19:11-20:5.

### 1. Credentials

Dr. Krueger graduated from Harvard Medical School in 1977. Hr'g Tr., Apr. 1, 2015, at 38:20-21. His experience in assessing paraphilic disorders began in the mid-1980's, while working at the Massachusetts Treatment Center in the Bridgewater Correctional Complex, where he assessed approximately one hundred individuals civilly committed for sexual violence. *Id.* at 39:9-15. For the past twenty years, he has served as the medical director of the Sexual Behavior Clinic at New York Psychiatric Institute in New York City. *Id.* at 39:20-22. As director, he runs the

psychobehavior clinic, which assesses juvenile sex offenders. *Id*. at 40:3-7. He also is a consultant to the New York State Office of Mental Health, where he assesses and treats sex offenders. *Id*. at 40:8-13. The doctor is currently engaged in helping rewrite the Paraphilic Disorder chapter in the Diagnostic and Statistical Manual. *Id.* at 40:14-21.

On several occasions Dr. Krueger has been qualified as an expert on paraphilic disorders in the United States District Court for the Eastern District of New York. *Id.* at 41:17-23. He has testified on the risk assessment of sex offenders and the treatment of individuals with paraphilic disorders. *Id*.

### 2. Methodology and Diagnosis

Dr. Krueger performed twenty-one tests to assess defendant's mental condition and sexual tendencies. Krueger Letter at 6-9. These tests were designed to explore pedophilic tendencies, other sexual interests, repulsions and attractions, mental illness, and risk assessment for sexual recidivism and sexual violence. *Id.*

The majority of the tests indicated that defendant:

- "[D]id not make use of [rapist] cognitions." *Id.* at 7, ¶ 5;

- "[D]id not make use of [pedophilic] cognitions." *Id.* at 7, ¶ 6;

- Was not "compulsive" in his use of pornography. *Id.* at 7, ¶ 7.

- Is at "low . . . risk of recidivism . . ." *Id.* at 11.

- "[N]ever abused a child in a hands on way." *Id*.

- "[I]s at low risk to his children . . ." *Id*.

The tests indicated that defendant's risk of sexually abusing his own children was "low" or "extremely low." *Id.* at 12; *see also* Hr'g Tr., Apr. 1, 2015, at 46:22-24 ("I applied a number of risk assessment instruments and these were low—his scores on these were lower, extremely low

on these five instruments).  Dr. Krueger also testified that the risk of R.V. abusing children other

than his own was "remote."  *Id*. at 47:10-14.  In sum, Dr. Krueger provided the following diagnoses

concerning the defendant:

Axis I:         1. . . . Pedophilia, with an interest in images of
                children only

                2. Opiate dependence with sustained remission in an
                uncontrolled environment

                3. Cocaine dependence with sustained remission in
                an uncontrolled environment

Axis II:        No diagnosis

Axis III:       1. Elevated cholesterol

Axis IV:        Stressors—severe—current legal situation

Axis V:         Highest level of functioning past year was 90

                Highest level of functioning past week was 60

Krueger Letter at 11.

### 3.  Findings

#### a.  Transition to Child Pornography

Dr. Krueger testified to the defendant's transition from viewing adult pornography to child

pornography, and the further progression to engaging in online chats with underage girls:

THE COURT:        When did he start looking at [pornography]?

THE WITNESS:      . . . I didn't give a specific time.  He said that
                  he had looked at it on and off for many years,
                  and that . . . he would download it, masturbate
                  to it, but that it was only within the past year

17

that he had looked [at] child pornography.
He stumbled on it and began viewing it.

Hr'g Tr., Apr. 1, 2015, at 47:21-48:3.   This expert also testified that, about the same time,

defendant began chatting online with underage girls:

> THE COURT:        He started having chats with underage
> children – girls, I assume?
>
> THE WITNESS:      Yes.
>
> THE COURT:        When?
>
> THE WITNESS:      Around that time.
>
> THE COURT:        A year before?
>
> THE WITNESS:      Yes, around – coincident with his interest in
> his use of child pornography.
>
> THE COURT:        And what brought on this change in his
> lifestyle?
>
> THE WITNESS:      He just said he stumbled onto it and began
> using it.  I would say this is not an infrequent
> – it's a strange – to try to establish how
> somebody develops a sexual interest pattern
> is – the explanation is in its infancy really.
> But he – basically, *this is not an unusual
> history for many who have looked at child
> pornography.*  You get elderly men who for
> many years have had sexual relationships
> and/or looked at pornography, and then for
> some reason, they'll migrate into this and –
> as opposed to getting out of it, will continue
> with it, and this was his pattern.
>
> THE COURT:        You have no opinion on what caused this
> sexual reversion, if that's the proper word?
>
> THE WITNESS:      No, aside from shifting into it and finding –
> becoming interested in it to the point that he

|  |  |
|---|---|
|  | would masturbate, no opinion – no opinion as to what caused it. |
| THE COURT: | But I don't understand the connection between that and his chatting with women? |
| THE WITNESS: | Well, he – one could say that he – if he's interested in images of minor females, prepubescent females, he indicated that he posed I think as a teenager and began engaging in chats with minor females. This would be, I would say, an extension of his interest involving – of his interest – vesicatory interest in minor females, he presumably would find it sexually titillating or interesting to be another facet of that interest pattern. |
| THE COURT: | Is that a normal progression for these people who – is that a normal progression from child pornography through computers into chats with young women? |
| THE WITNESS: | I would say it's one progression. It's – you can find individuals who have – will just stick with images and that's it, alone. You'll have some individuals who will move to chatting and stop at that. You'll have other individuals that will look at pornography and go to chatting and then actually try to meet or actually abuse one. |
| THE COURT: | What is the percentage of those who go from pornography, child pornography, who as you say, have drifted into it, into chats with young ladies – young women, I should say, young females, I guess? |
| THE WITNESS: | Offhand, I don't know. I would say it would be a relatively small proportion, but I don't have specific numbers. |
| THE COURT: | And what proportion of that proportion drifts into physical relationships, not necessarily sexual? |

19

THE WITNESS:      Well, again, I think that it would be relatively small.  I mean, I think of the – let me just think.  This would be basically a question – some questions for literature review – but *to my best knowledge, individuals who are arrested for child pornography, a relatively small portion of them will have additional charges involving – additional prior charges involving abuse of minors, relatively small portion.*

*Id*. at 48:17-51:5 (emphasis added).

Dr. Krueger testified that defendant's transition to watching child pornography "is not an unusual pattern."  *Id*. at 80:22-23.  He explained:

I have evaluated on the order of 350 individuals involved with child pornography or psychosexual interaction.  Most[ly] all of them are male.  And in a substantial portion of cases, individuals have had, you know, by all external appearances, they're doing fine, and this is the index of their first crime.  And they – a substantial portion have been elderly men – thirties, forties, fifties, sixties – that just become taken by it.

*Id*. at 80:23-81:5.

The internet age increased the volume and accessibility of child pornography:

THE WITNESS:      I mean, there's been much written about this.  You have pornography.  Where is pornography viewed at? It's viewed in the privacy of one's home.  So you can instantly get it.  You can sort of do it privately.  You can think of doing it.  Nobody's really looking at it.  So the situation for looking at pornography is secretive and it's very accessible.  And you know, that's how – I mean, we're getting all sorts of cases of individuals that sort of zero in on pornography and the most bizarre things you can possibly imagine, but they do it, you know, privately, so to speak.

| | |
|---|---|
| THE COURT: | Is that partially due to the availability on the internet – |
| THE WITNESS: | Yes. |
| THE COURT: | – within privacy, which I take it is a relatively recent innovation? |
| THE WITNESS: | Absolutely. And the whole evolution of pornography on the internet is a relatively recent thing. There have been increasing amounts written as to how pervasive it is and extensive it is, and there's a vast myriad of pornography. People think that they are looking at it and nobody's looking at them. |
| THE COURT: | So it increased from the period, I suppose, when you would have to look at cards or photographs and go out and get them? |
| THE WITNESS: | Yes. I mean, there used to be you had print pornography of all sorts everywhere. And I think there's been a discussion that since with the advent of the sort of video camera and then online, there's been an incredible explosion of child pornography – well, of pornography and child pornography, people being arrested for child pornography. This is a function of the sort of the internet age. |

*Id*. at 83:18-85:1.

According to Dr. Krueger, such easy access and increased availability of child pornography online could also affect the deterrent value of heavy sentences:

| | |
|---|---|
| THE COURT: | Well, from a medical point of view, given the general circumstances of availability and perhaps desire in the general population, do the deterrent effects of heavy sentences have an impact of any substantial nature on the number of people who will be violating this law? . . . |
| THE WITNESS: | Well, I would say that the deterrent effect is minimized by virtue of the mechanics of the |

21

> internet, that basically people are in their
> home, alone, kind of thinking they're private
> – privacy and they click and they, you know,
> they feel somewhat uncomfortable, but it's
> not like they – it's just so easy to do, so easy
> to do that. I'm not sure that the deterrent
> effect is affecting such behavior.

*Id*. at 91:20-92:10.

### b. No Physical Threat to Children

The expert noted there was no evidence that defendant had engaged in hands-on abuse of

any child:

> [R.V.'s] acquisition of child pornography appears to have occurred
> over a relatively brief period of time. It also appears that his
> predominate sexual preference has been for adult females. *There is*
> *no indication that he has ever tried to meet or abuse a minor and*
> *his risk of doing so is low or extremely low according to 5*
> *instruments used to assess such risk*.

Krueger Letter at 12 (emphasis added).

Specifically, Dr, Krueger indicated that:

> [T]here was *no indication that [R.V.] had even attempted or*
> *fantasized about his children or that he had abused his children*, and
> *in my opinion, he could live with his children without placing his*
> *children at risk*. . . . I applied a number of risk assessment
> instruments and these were low – his scores on these were lower,
> extremely low on these five instruments.

*Id*. at 46:18-24 (emphasis added); *see also* Krueger Letter at 11. With a "reasonable degree of

medical certainty," the defendant could live at home without posing a danger to his children. Hr'g

Tr., Apr. 1, 2015, at 54:24-25.

> [COUNSEL]:  Dr. Krueger, in your expert medical opinion
> is [R.V.] a danger to his children?
>
> [THE WITNESS]:  *He is not a danger to his children*.

*Id*. at 63:16-63:18 (emphasis added); *see also id*. at 55:7-11.

The expert also testified that R.V. is not a threat to other children:

> [COUNSEL]: In your expert medical opinion, do you believe that [R.V.] is a danger to other children?
>
> [THE WITNESS]: [I]n my opinion, *he is not a danger to other children*.

*Id.* at 63:19-22 (emphasis added); *see also id.* at 47:10-14.

### c. Recidivism Risk

The expert testified that in most cases involving viewers of child pornography the recidivism rate is low. *Id.* at 53:11-17. In this expert's opinion, this conclusion applied to defendant R.V. *Id.* at 53:19-21.

As noted above, Dr. Krueger's tests showed that defendant's risk of sexual violence and re-offense was "low" or "extremely low." Krueger Letter at 12; Hr'g Tr., April 1, 2015, at 46:22-24. Moreover, according to Dr. Krueger, R.V.'s recidivism risk would decrease further if he were allowed to continue treatment under federal supervision as part of a non-custodial sentence:

> [COUNSEL:] So in 95 to 97 percent of cases, once someone is arrested for child pornography, they don't go back to looking at it?
>
> [THE WITNESS:] I would say ballpark. I mean, again, there are some meta-analyses and other things. I didn't review them immediately before this, but they are on that order. I would say the rate of recidivism, depending on the length of time, is on the order of three to five percent.
>
> . . .
>
> THE COURT: And is that applicable to this defendant?
>
> THE WITNESS: Yes. I would say that many of those studies that have been done basically just contemplate[] the intervention of the legal system only. It's not clear what percent have

been involved in treatment or what percent are not involved in treatment or what the nature of supervision is.

So I think that these additional factors, *if he were to receive a community – non-custodial sentence, he would have federal supervision. He would have treatment. This would have a very substantial impact upon decreasing this risk.*

THE COURT:    *That's lower than the three to five percent*?

THE WITNESS:    *Much lower, yes.*  I would characterize his risk as remote if he continues in treatment. Anyway, I would characterize it as remote, but even more remote if he continues in treatment under federal supervision.

Hr'g Tr., Apr. 1, 2015, at 53:11-54:12 (emphasis added); *see also* Krueger Letter at 12 ("This risk would be reduced even further by participation in and completion of a sex offender specific program, and by the usual conditions of monitoring by federal probation in the community.").

### 4. Recommendation for Sentence

In recommending a non-incarceratory sentence, the expert testified to the significance of the ACS investigation in making the determination that R.V. posed no danger to his own children:

THE WITNESS:    Well, so the issue is, did he abuse his kids? . . . *Child Protection Services was doing an evaluation, and they concluded no abuse indicated. That's a very powerful thing.*  We refer to . . . at the clinic . . . Child Protection Services all the time.  We deal with them a lot.  *If they concluded it hasn't happened, that's the best you can get.*  With . . . a Family Court petition, I don't know.  I mean, if there were concerns – they must have been concerned about some criminality and – but this seems to be in abeyance.  So it seems to me the way the evidence is, he did not abuse his children.  Even if he had – and we regularly will deal with basically cases where

24

individuals have abused their children, the issue is whether they can be reunited with their children and have unsupervised contact. His wife is reliable – appears [to] be a reliable reporter. His children are of age that they could outcry, and he's in a therapeutic environment at Mustard Seed that is going to be . . . very attentive to these issues. *So I think his children are well protected, and I think he should be allowed immediate unsupervised contact with his children.* That would be my recommendation. I would not make that if I was not, you know, of that opinion. In other cases, I'm very conservative in terms of placing somebody back with their family. *I mean, there's no evidence that he's ever even abused his children.*

THE COURT: I take it your conclusion would be a *non-incarceratory sentence* with substantial close supervision and treatment?

THE WITNESS: Yes.

Hr'g Tr., Apr. 1, 2015, at 94:17-95:22 (emphasis added).

The expert noted that separating R.V. from his family would harm his children:

It is my opinion to a reasonable degree of medical certainty that he could live with his family without placing his children at risk. Indeed, given the negative effects of his separation from his children, it is my opinion that *it would be in his children's best interest to be reunited with him.*

Krueger Letter at 12 (emphasis added); *see also* Hr'g Tr., Apr. 1, 2015, at 54:23-55:3.

Dr. Krueger also opined about R.V's response to Mustard Seed's treatment:

[COUNSEL]: And what were your impressions of [Dr. Ford's treatment] recommendation?

[THE WITNESS]: That [R.V.] had been with the program. He had been there. He was motivated. He was motivated, that he was cooperating. They gave him a good prognosis, and it seems to

25

|                    |                                                                                                                                                                                                                              |
|--------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                    | me an appropriate program that will well take care of [R.V.].                                                                                                                                                                 |
| [COUNSEL]:         | Ok.                                                                                                                                                                                                                           |
| [THE WITNESS]:     | I would also like to add that it could certainly aid in the sort of management of his overall risk. They have the capability of doing random drug screens. They have the capability of bringing in family members, working with wives which could be beneficial. |
| [COUNSEL]:         | Is there any other therapy that you might recommend for [R.V.] that you might find helpful?                                                                                                                                    |
| [THE WITNESS]:     | No. I think that – I think that if you were allowed to be in the community under conditions of federal probation, federal supervision would be helpful. And I think that his participation in Mustard Seed would be a very appropriate program, good program. |

Hr'g Tr., Apr. 1, 2015, at 62:22-63:15.

**B. Social Worker**

Vivianne Guevara, Director of Client and Mitigation Services at the Federal Defenders of New York and a licensed social worker, conducted an assessment of R.V.'s family. Ms. Guevara submitted a written evaluation and testified on the state of R.V.'s family and R.V.'s contribution to his family. *See* R.V. Sent. Mem., Mar. 30, 2015, ECF No. 41 (sealed), at Ex. C ("Family Assessment"); Hr'g Tr., Apr. 1, 2015, at 5:20-37:4. In order to conduct her assessment, Ms. Guevara met with R.V. alone once and with R.V. and his family four times. *Id*. at 8:2-3. The last three meetings with R.V.'s family took place in R.V.'s home and lasted between one hour to one hour and a half each. *Id*. at 8:10-13.

Ms. Guevara testified that she observed "a very close-knit family who was very supportive of each other, the children even supportive of their own parents . . . and parents that are very supportive of their children most of all, very interested in their children's success." *Id*. at 13:17-25. She noted that, while R.V.'s arrest in this case "could have potentially fragmented this family" it instead "created a new sense of value, and a bond created by a shared experience, from which they all hope to move forward." Family Assessment at 6.

Ms. Guevara spoke to the extent of R.V.'s critical contribution to his family unit:

> [R.V.] even before this case was responsible for all of the financial income for the family. He brought in and brings in the only income for the family. . . .
>
> In addition to the financial responsibility, he does make most of the meals in the home. That is a huge responsibility. And also important, he is a good co-parent in the family. [R.V.'s wife] has held the family together when he wasn't in [the] home, but it was a huge burden, and together, they parent these children. *Without him there, it would be a huge burden financially and parenting-wise on the entire family*.

Hr'g Tr., Apr. 1, 2015, at 14:16-18; 15:1-7 (emphasis added).

The social worker concluded that R.V.'s absence would have a negative impact on his family. *Id*. at 19:19-21 ("The children love their father they look to him for support and guidance and without him, they would be missing an important part of their lives[.]"). According to Ms. Guevara, R.V.'s continued presence in his home would benefit both his family as well as R.V.'s own treatment:

> [R.V.'s] presence and participation in the home is vital to this family's healing and progress, as well as [R.V.'s] own productivity and compliance. [R.V.'s] family is a protective factor that will motivate him to seek outlets and activities that will be in compliance with his restrictions and benefit his and his family's overall health and healing.

Family Assessment at 6.

### C. Family

On April 24, 2015 the court ordered that R.V.'s wife and children be present in person at R.V.'s sentencing hearing. Scheduling Order, Apr. 24, 2015, ECF No. 45.

The court observed and questioned defendant's children. There was a clear indication of a loving relationship among parents and children.

## IV. Sentence Imposed

Defendant was sentenced on April 30, 2015. *See* Sent. Hr'g. Before sentencing, R.V. affirmed his guilty plea. *Id.* at 24:21-26:11.

The total Guidelines offense level is 28. The criminal history category is I, yielding a Guidelines imprisonment range of 78-97 months. U.S.S.G. Ch. 5 Pt. A; *see also* Sent. Hr'g, at 28:8-9.

Defendant was sentenced to time-served and seven years supervised release, with the requirement of intense continuing treatment. *See* Sent. Hr'g, at 37:17-24. The sentence represents a downward departure from the Guidelines. Defendant was ordered to pay $2,000 in restitution, a $12,500 fine and $100 special assessment. *See id.* at 24:9-11, 28:15-20.

The sentencing proceedings were videotaped to develop an accurate record of the courtroom atmosphere, as well as some of the subtle factors and considerations that a district court must consider in imposing a sentence. *See In re Sentencing*, 219 F.R.D. 262, 264-65 (E.D.N.Y. 2004) (describing the value of video recording for possible review of sentences on appeal).

## V. Sentencing Context

### A. Shifting Societal Norms

Views on what delineates the bounds of acceptable pornography have varied, as anyone is aware who visits the excavations of Herculaneum—long-buried by ashes from Mount Vesuvius—where ancient public pornography is preserved. The works of great Renaissance and early Impressionist artists immortalized the images of children as sexual objects. *See Mass. v. Oakes*, 491 U.S. 576, 593 (1989) (Brennan, J., dissenting) ("Many of the world's greatest artists—Degas, Renoir, Donatello, to name but a few—have worked from models under 18 years of age . . . .").

One need not look so far back to encounter different social mores. "[I]t was not until the 1880s that the age of consent in America was raised from ten years of age. Indeed the concept of an 'in-between' period existing between childhood and adulthood, known as adolescence, did not develop until the early twentieth century." Michael J. Henzey, *Going on the Offensive: A Comprehensive Overview of Internet Child Pornography Distribution and Aggressive Legal Action*, 11 Appalachian J.L. 1, 3 (2011) (footnotes omitted). "[E]rotic accounts of adult-child sex were commonplace in nineteenth century literature; Victorian era photographs and prints of young teenagers and pre-pubescent children also existed." *Id.* (footnote omitted).

The advent of photography spurred the "production, collection and exchange of pornographic material depicting children" in the mid-nineteenth century. Jessica A. Ramirez, *Propriety of Internet Restrictions for Sex Offenders Convicted of Possession of Child Pornography: Should We Protect Their Virtual Liberty at the Expense of the Safety of Our Children?*, 12 Ave Maria L. Rev. 123, 125 (2014). By the 1960s, the accessibility of child pornography had increased. *Id.* (footnote omitted). At this time,

> President Lyndon B. Johnson's Commission on Pornography and
> Obscenity determined that the nation would be best served by
> repealing all laws that restrict the distribution of obscene materials.
> In the U.S., materials clearly advertised as child pornography
> became widely available for purchase in stores.

Henzey, *supra*, at 4-5 (footnotes omitted); *see also* Emily Weissler, *Head Versus Heart: Applying Empirical Evidence About the Connection Between Child Pornography and Child Molestation to Probable Cause Analyses*, 82 Fordham L. Rev. 1487, 1492 (2013) ("[I]n the 1960s, there was a general relaxation of censorship standards, and pornographic pictures and films of children became more widely available.") (footnote omitted).  But the late 1970s saw a shift in mindsets:

> [In the 1970s, feminist groups and others] began pushing back on
> the liberal sexual attitudes of the 1960s and 70s. . . . Congress and
> state legislatures passed statutes specifically targeting child
> pornography as a crime, distinct from obscenity, by the late 1970s.
> The open trade era of child pornography and relaxed attitudes
> towards adult-child sex had come to an end.

*Id.*

Photographic child pornography came in "formats like magazines, 16-millimeter movie film, Polaroid pictures . . . ."  Gray Mateo, *The New Face of Child Pornography: Digital Imaging Technology and the Law*, 2008 U. Ill. J.L. Tech. & Pol'y 175, 178 (internal quotation marks and footnote omitted); *see also* Ramirez, *supra*, at 125 ("through most of the twentieth century . . . these images were usually produced at the local level, were costly and of poor quality, and were difficult to acquire") (footnote omitted); Eric Griffin-Shelley, *Sex and Love Addicts, Who Sexually Offend: Two Cases of Online Use of Child Pornography*, 21 Sexual Addiction & Compulsivity: The J. of Treatment & Prevention 322, 323 (2014) ("Mail or adult bookstores were the vehicles for finding child pornography prior to the 21st century.").  Prior to the advent of the Internet, "production and duplication of [child pornography] required expensive equipment of the kind not

normally found in the average home.  To distribute images of child abuse, one had to either personally transport them or rely on a domestic mail carrier.  Unsurprisingly, these challenges and risks may have served as barriers to offending for some persons who would have otherwise been inclined to obtain [child pornography]."  Erik Faust, *et al.*, *Child Pornography Possessors and Child Contact Sex Offenders: A Multilevel Comparison of Demographic Characteristics and Rates of Recidivism*, Sexual Abuse: A Journal of Research and Treatment (Feb. 19, 2014), http://sax.sagepub.com/content/early/2014/02/19/1079063214521469, at 2.

Efforts in the 1980s "to suppress the American child-porn trade—a small network of adult bookstores and mail-order services—were so successful that within a decade the market was all but nonexistent."  Rachel Aviv, *The Science of Sex Abuse: Is it Right to Imprison People for Heinous Crimes They Have Not Yet Committed?*, The New Yorker, Jan. 14, 2013; Henzey, *supra*, at 4-5 ("By 1986, most of the traditional methods of distributing child pornography were shut down.").

The Internet revolution "undid those [control] achievements."  *Id.*

## B.  Changing Technological Landscape

### 1.  Personal Computer Revolution

The "personal computer revolution" was launched in 1976, with the introduction of the "Apple I" computer and in 1977, with the introduction of the "Apple II."  M. Scott Boone, *The Past, Present, and Future of Computing and Its Impact on Digital Rights Management*, 2008 Mich. St. L. Rev. 413, 416 (2008) (footnote omitted).  Still, at first the number of personal computers was quite small; only around two hundred Apple I computers were produced.  *Id.* (footnote omitted).  "The late 1970s and early 1980s saw the first spread of computers from isolated government and industrial usage to everyday personal usage."  Audrey Rogers, *From Peer-to-Peer*

*Networks to Cloud Computing: How Technology Is Redefining Child Pornography Laws*, 87 St. John's L. Rev. 1013, 1028 (2013) (footnote omitted).  By 1993, Apple "produced over six million personal computers within the Apple II model series."  Boone, *supra*, at 416 (footnote omitted).

By 2014, eight in ten adults in the United States would report that "they use laptop and desktop computers somewhere in their lives—at home, work, school, or someplace else."  Susannah Fox & Lee Rainie, *The Web at 25 in the U.S., Part 1: How the Internet has Woven Itself into American Life*, Pew Research Center (Feb. 27, 2014), http://www.pewinternet.org/2014/02/27/part-1-how-the-internet-has-woven-itself-into-american-life/.  The following graphic represents this rapid increase:



*Id.*

## 2.  Internet Revolution

[In] [t]he late 1970s and early 1980s . . . connectivity between computers was evolving.  In the 1970s, computer engineers at research institutions throughout the United States began to link their computers together using telecommunications technology. The first

> networking card was created in 1973, allowing data transfer between connected computers. In time, the network, originally limited to academic and military institutions, spread and became known as the Internet.

Rogers, *supra*, at 1028 (footnotes omitted). Linking of computers allowed for the increasing popularity of online discussions and file-sharing. *Id.* As Audrey Rogers recounts:

> In the 1990s, the tandem spread of applications like e-mail and the World Wide Web and the development of fast networking technologies like Ethernet saw computer networking become commonplace. . . .
>
> While file-sharing was initially done through Usenet and Bulletin Boards, in 1999, Napster was released. Napster was a centralized system that indexed and stored music files that users of Napster made available on their computers for others to download. Files were transferred directly between users after authorization by Napster. It became extremely popular, and in 2001, Napster was sued by several recording companies. Napster lost in court against these companies and was eventually shut down.
>
> The next technological milestone was the development of decentralized file-sharing systems. The decentralized systems allow users to directly connect to each other's files, rather than going through a central index site. In 2001, Kazaa was released, with users mainly exchanging music files and other file types, such as videos, applications, and documents, over the Internet. Until its decline in 2004, Kazaa was the most popular file-sharing program in the world. As with Napster, it faced, and lost, numerous copyright infringement suits, until it declined in use and popularity.
>
> New iterations of file-sharing networks, such as Limewire and BitTorrent, continue to allow no-cost, decentralized, peer-to-peer file-sharing. Furthermore, file-sharing software evolved, so that computer users no longer had to install and configure sophisticated multiple file-sharing programs.

*Id*. at 1028-31 (footnotes omitted).

In 1995, just 14% of adults in the United States had Internet access. Fox & Rainie, *supra* (footnote omitted). In fact, only 42% of adults had even heard of the Internet, and "an additional

21% were vague on the concept—they knew it had something to do with computers and that was about it." *Id.* Less than two decades later, in January 2014, 87% of adults in the United States *used* the internet:



Pew Research Center, *Internet User Demographics* (Jan. 2014) (showing the large percentage of the adult population in the United States using the internet in 2014), http://www. pewinternet.org/data-trend/internet-use/latest-stats; *see also Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 377 (E.D.N.Y. 2015) (same). At this point, there was "near-saturation usage among those living in households earning $75,000 or more (99%), young adults ages 18-29 (97%), and those with college degrees (97%)." Susannah Fox & Lee Rainie, *The Web at 25 in the U.S., Summary of Findings*, Pew Research Center (Feb. 27, 2014), http://www.pewinternet.org/2014/02/27/the-web-at-25-in-the-u-s/.

The "rise of the internet changed the way that people got information and shared it with each other, affecting everything from users' basic social relationships to the way that they work, learn, and take care of themselves." *Three Technology Revolutions*, Pew Research Center,

http://www.pewinternet.org/three-technology-revolutions/; *see also* Amanda Lenhart, *Teens, Social Media & Technology Overview 2015*, Pew Research Center (Apr. 9, 2015), http://www.pewinternet.org/2015/04/09/teens-social-media-technology-2015/. Today, "the Internet has become the most fundamental global communications and knowledge infrastructure of our age, and is fast becoming the basic data-and-control network of the coming decade." Yochai Benkler & David D. Clark, *Introduction*, 2016 Daedalus J. of the Am. Acad. of Arts & Scis. 5.

### a. Broadband Revolution

"The speed of internet connectivity picked up considerably with the rise of broadband connections. As people adopted . . . higher-speed, always-on connections, they became different internet users: They spent more time online, performed more activities, watched more video, and themselves bec[a]me content creators." *Three Technology Revolutions*, Pew Research Center, *supra*; *see also* Dr. Raul Katz, *The Impact of Broadband on the Economy: Research to Date and Policy Issues*, ITU, (April 2012), https://www.itu.int/ITU-D/treg/broadband/ITU-BB-Reports_Impact-of-Broadband-on-the-Economy.pdf, at 1 ("The diffusion of broadband, defined as the technology that enables high-speed transfer of data, is inextricably linked to the emergence of the Internet. While at its initial stages the Internet was primarily accessed through dial-up means, consumer and enterprise demand prompted the development of technologies that facilitated access at higher speeds.") (footnote omitted). The following graphic illustrates this revolution:



PEW RESEARCH CENTER

*Three Technology Revolutions*, Pew Research Center, *supra*.

### b. Rise of Mobile Connectivity

By the spring of 2015, "64% of American adults . . . own[ed] a smartphone of some kind, up from 35% in the spring of 2011." Aaron Smith, *U.S. Smartphone Use in 2015*, Pew Research Center (Apr. 1, 2015), http://www.pewinternet.org/2015/04/01/us-smartphone-use-in-2015/. As a result of "mobile connectivity through cell phones, and later smartphones and tablet computers . . . any time-anywhere access to information [is now] a reality for the vast majority of Americans," as shown below:



PEW RESEARCH CENTER

*Three Technology Revolutions*, Pew Research Center, *supra*.

Mobile connectivity has, in turn, "changed the way people think about how and when they can communicate and gather information by making just-in-time and real-time encounters possible. [It has] also affected the way people allocate their time and attention." *Id.*; *see also* Andrew K. Przybylski & Netta Weinstein, *Can You Connect with Me Now? How the Presence of Mobile Communication Technology Influences Face-to-Face Conversation Quality*, 30 J. Soc. Pers. Relationships 237, 237-46 (2012) ("Interviews reveal mobile phones provide a continual sense of connection to the wider social world—a feeling that persists even if a mobile is in 'silent mode.'") (citation omitted).

### c. Rise of Social Media

By 2011, the social networking site "Facebook host[ed] 140 billion photos." *See* Jay Yarow, *Chart of the Day: Facebook's Huge Trove of Photos in Context*, Business Insider (Sept. 19, 2011), http://www.businessinsider.com/chart-of-the-day-the-largest-photo-libraries-in-the-world-2011-9/. As a result, "[p]eople now see more images in a day than our ancestors would have seen in their lives; over 3.5 trillion photos have been taken, and there are ubiquitous tools for sharing such photos." Elizabeth G. Porter, *Taking Images Seriously*, 114 Colum. L. Rev. 1687, 1699 (2014).

Today, social media and social networking affect "the way that people think about their friends, acquaintances, and even strangers." *Three Technology Revolutions*, Pew Research Center, *supra*. In the past, people had mostly physical social networks comprised of family and friends. That has changed radically.

> The new reality is that as people create social networks in technology spaces, those networks are often bigger and more diverse than in the past. . . . One of the major impacts was that the traditional boundaries between private and public, between home and work, between being a consumer of information and producer of it were blurred.

*Id.*

### d. Emergence of the Cloud

Cloud computing represents the "newest technology:"

> [F]iles are stored in a shared pool of computer resources on the Internet, accessible from any computer. Users do not download and install applications on their own device or computer; all processing and storage is maintained by the cloud server. The latest commercial uses promote file storage and access. For example, a person may store files from his computer onto a cloud service provider, such as Dropbox. The cloud system allows him to access his files from any computer by logging onto his cloud server. A cloud user may permit shared access to his files by designating

users. Thus, similar to peer-to-peer networks, once a person allows access to his files, others may see them at any time. Unlike peer-to-peer networks, private cloud services require that a person designate who may have shared access.

*The cloud is just the latest battleground between law enforcement and child pornographers*. The ability of child pornographers to use cloud computing for their wares has already been recognized. While some cloud providers are employing filtering techniques to suppress access to illegal images, there is a growing concern the cloud will provide deeper cover for pornographers. At the same time, cloud technology is beginning to raise possession and distribution questions.

Rogers, *supra*, at 1032-33 (emphasis added; footnotes omitted).

## C. How Internet Revolution Enabled Child Pornography Consumption

The Internet revolution had a dramatic impact on the availability of pornography generally. "In 1991, the year the World Wide Web went online, there were fewer than ninety different adult magazines published in America." Ogi Ogas & Sai Gaddam, A Billion Wicked Thoughts: What the Internet Tells Us About Sexual Relationships 8 (2012) (comprehensive study by neuroscientist of online pornography use). According to what the authors dubbed the "most comprehensive collection of porn-use stats on the web," in 2010, about 4 percent of the most trafficked websites in the world were sex-related. Julie Ruvolo, *How Much of the Internet is Actually for Porn*, Forbes, Sept. 7, 2011 (interviewing neuroscientist Ogi Ogas). "From July 2009 to July 2010, about 13% of Web searches were for erotic content." *Id*. To put the numbers in perspective, "Xvideos, the largest porn site on the web with 4.4 billion page views per month, is three times the size of CNN or ESPN, and twice the size of Reddit. LiveJasmin isn't much smaller. YouPorn, Tube8, and Pornhub—they're all vast, vast sites that dwarf almost everything except the Googles and Facebooks of the internet." Sebastian Anthony, *Just How Big Are Porn Sites?*, ExtremeTech.com (Apr. 4, 2012), http://www.extremetech.com/computing/123929-just-how-big-are-porn-sites.

"Approximately three quarters of men and half of women have intentionally viewed pornography over the internet."  Kelly M. Babchishin, *et al.*, *Online Child Pornography Offenders are Different: A Meta-Analysis of the Characteristics of Online and Offline Sex Offenders Against Children*, 44 Arch. of Sexual Behav. 45, 45 (2015) (citation omitted).

The effect of the Internet revolution has been to largely remove physical barriers to child pornography.  *See* Faust, *et al.*, *supra*, at 2-3.  The Internet has been described as offering a "triple A engine of anonymity, availability, and affordability."  Weissler, *supra*, at 1496 (internal quotation marks and footnote omitted).  Digital media, in various forms,

> offer[s] quick and easy ways of producing and duplicating sexually explicit images or videos of minors.  Furthermore, the Internet allows for the rapid exchange of these images between users from all parts of the globe.  As the ability to store large amounts of data at low cost increases, users are easily able to retain voluminous quantities of images and video.  The *true quantity of child abuse images stored around the world is incalculable*, and the ability of interested individuals to access this data is limited only by the extent of their technical knowledge and their willingness to risk detection.  With most homes and businesses offering ready access to a computer and the Internet along with the relative anonymity associated with the massive volume of online transactions, *the perceived risk of involvement with child abuse images has diminished considerably*.

Faust, *et al.*, *supra*, at 2-3 (emphasis added).

As noted by the United States Sentencing Commission,

> [t]hese technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre that previously was not as widely circulated as it is today.  As a result of such changes, entry-level offenders now easily can acquire and distribute large quantities of child pornography at little or no financial cost and often in an anonymous, indiscriminate manner.

U.S. Sentencing Comm'n, *Federal Child Pornography Offenses* (Dec. 2012), at 312-13 (footnote omitted); *see also* Richard Wortley & Stephen Smallbone, U.S. Dep't of Justice, Off. of Community Oriented Policing Servs., *Child Pornography on the Internet*, Problem-Oriented Guides for Police Problem-Specific Guides Series No. 41 (May 2006), http://www.popcenter.org/problems/pdfs/ChildPorn.pdf, at 8 ("The Internet has escalated the problem of child pornography by increasing the amount of material available, the efficiency of its distribution, and the ease of its accessibility."); Kathryn C. Seigfried-Spellar, *et al*., Internet Child Pornography, U.S. Sentencing Guidelines and the Role of Internet Service Providers, 88 Inst. for Computer Scis., Soc. Informatics & Telecomm. Eng'r 17, 25 (2012) ("Researchers agree the amount of child pornography available via the Internet is unknown, and *its complete removal remains impossible*.") (citation omitted; emphasis added).

Today, "[c]hild pornography images are readily available through virtually *every Internet technology* including websites, email, instant messaging/ICQ, Internet Relay Chat (IRC), newsgroups, bulletin boards, peer-to-peer networks, and social networking sites."  Dep't of Justice, Child Exploitation and Obscenity Section, *Child Pornography*, http://www.justice.gov/criminal-ceos/child-pornography (emphasis added); *see also* Krueger, *et al.*, *Sexual and Other Axis I Diagnoses of 60 Males Arrested for Crimes Against Children Involving the Internet*, *supra*, at 625 ("[C]hild pornography is much easier to acquire over the Internet, with only a few clicks of a mouse, compared with printed pornography or DVDs, which would require much more time and effort to obtain . . . . [T]he intensity of deviant sexual interest is likely to be greater in those who need to expend more effort to acquire pornography from sources other than the Internet.").  The following charts lay out many ways that child pornography is accessed, shared and downloaded on the Internet:

| Method | Use |
|---|---|
| Web pages and websites | Specific child pornography websites may be created, or child pornography images may be embedded in general pornography sites. However, there is debate about how much child pornography is available on the web. Some argue that it is relatively easy to find images.[14] Others argue that, because of the vigilance of ISPs and police in tracking down and closing child pornography websites, it is unlikely that a normal web search using key words such as childporn would reveal much genuine child pornography.[15] Instead, the searcher is likely to find legal pornographic sites with adults purporting to be minors, 'sting' operations, or vigilante sites. One strategy of distributors is to post temporary sites that are then advertised on pedophile bulletin boards. To prolong their existence these sites may be given innocuous names (e.g., volleyball) or other codes (e.g., ch*ldp*rn) to pass screening software. The websites may be immediately flooded with hits before they are closed down. Often the websites contain Zip archives, the password for which is then later posted on a bulletin board. |
| Web cam | Images of abuse may be broadcast in real time. In one documented case of a live broadcast, viewers could make online requests for particular sexual activities to be carried out on the victim.[16] |
| E-mail | E-mail attachments are sometimes used by professional distributors of child pornography, but more frequently they are used to share images among users, or they are sent to a potential victim as part of the grooming/seduction process. This method is considered risky by seasoned users because of the danger in unwittingly sending e-mails to undercover police posing as pedophiles or as potential victims. |

| | |
|---|---|
| E-groups | Specific child pornography e-groups exist to permit members to receive and share pornographic images and exchange information about new sites. Some of these groups appear on reputable servers and are swiftly shut down when they are detected. However, they may use code names or camouflage child pornography images among legal adult pornography to prolong their existence. |
| Newsgroups | Specific child pornography newsgroups provide members with a forum in which to discuss their sexual interests in children and to post child pornography. This is one of the major methods of distributing child pornography. Some child pornography newsgroups are well known to both users and authorities (for example, the *abpep-t* or alternative binaries pictures erotica pre-teen group). Most commercial servers block access to such sites. Some servers do provide access to them but a user runs the risk of having his/her identity captured either by the credit card payments required for access, or the record kept by the server of his/her IP address. However, a computer-savvy user can access these groups by using techniques that hide his/her identity by concealing his/her true IP address. |
| Bulletin Board Systems (BBS) | Bulletin boards may be used legally to host discussions that provide advice to seekers of child pornography, including the URLs of child pornography websites and ratings of those sites. These bulletin boards may be monitored by system administrators to exclude bogus or irrelevant postings, such as from vigilantes. |
| Chat rooms | Chat rooms may be used to exchange child pornography and locate potential victims. Chat rooms may be password-protected. Open chat rooms are avoided by seasoned child pornographers because they are often infiltrated by undercover police. |
| Peer-to-peer (P2P) | P2P networks facilitate file sharing among child pornography users. These networks permit closed groups to trade images. |

Wortley & Smallbone, *supra*, at 10-11.

With the decrease in popularity of fee-based websites, the use of peer-to-peer networks to share and exchange child pornography has steadily increased. *See* Jelani Jefferson Exum, *Making the Punishment Fit the (Computer) Crime: Rebooting Notions of Possession for the Federal Sentencing of Child Pornography Offenses*, 16 Rich. J.L. & Tech. 8 (2010), http://

jolt.richmond.edu/v16i3/article8.pdf, at 5; Ryan Hurley, *et al.*, *Measurement and Analysis of Child Pornography Trafficking on P2P Networks* (May 2013) http://forensics.umass.edu/pubs/hurley.www.2013.pdf, at 1 (footnote omitted) (noting that peer-to-peer networks have become the "most popular mechanism for the criminal acquisition and distribution of *child sexual exploitation imagery*, commonly known as *child pornography*."); *cf.* Maggie Muething, *Inactive Distribution: How the Federal Sentencing Guidelines for Distribution of Child Pornography Fail to Effectively Account for Peer-to-Peer Networks*, 73 Ohio St. L.J. 1485 (2012).

"Peer-to-peer networks, a relatively recent technological development[,] . . . allow[] users to download files from the computers of other users. Unlike other means of acquiring files over the Internet, such as in a chat room or using e-mail . . . no personalized contact is required between the provider and receiver." *Id.* at 1487-88 (footnotes omitted). Popular networks include "LimeWire, BitTorrent, Gnutella, eDonkey, Grokster, Kazaa and sundry others, [which] operate by directly connecting network participants to one another without the use of a centralized server." *United States v. Handy*, No. 6:08-CR-180, 2009 WL 151103, at *1 (M.D. Fla. Jan. 21, 2009). Joining a network does not require installation of "sophisticated multiple file-sharing programs." Rogers, *supra*, at 1031 (footnote omitted). A user "need only download the compatible software from the Internet to become part of the network and be able to download digital files from other members of that network" or upload or post files to the network. *Id.* (footnotes omitted). The content of the shared files is not monitored by the peer-to-peer network. Muething, *supra*, at 1489.

"A crucial aspect of peer-to-peer file-sharing is that the default setting for these networks is that downloaded files are placed in the user's 'shared' folder, which allows others in the network

to access the files.  A user must affirmatively change his network setting to disable this sharing feature.  The network is designed to encourage sharing by providing faster downloading if the user allows sharing."  Rogers, *supra*, at 1031 (footnotes omitted); *see also* Muething, *supra*, at 1489 ("To encourage uploading, peer-to-peer programs often provide incentives, such as faster downloading capabilities, to users who share files.") (footnote omitted); *cf. Handy*, 2009 WL 151103 at *1 (noting the different ways in which peer-to-peer programs operate and  that "the specific type of [peer-to-peer] application installed on a defendant's computer, and what settings are in place within that [peer-to-peer] application, are critical to the determination of whether a defendant's Guideline sentence should be enhanced pursuant to § 2G2.2(b)(3)(F).").  Although child pornography files are generally "only available for a short amount of time (only about 30% are available for more than 10 days of the year), there are at least tens of thousands of unique [child pornography] files available on [peer-to-peer] networks for download each day."  Hurley, *et al.*, *supra*, at 1.

According to the Sentencing Commission, most of the offenders who are found to "distribute" child pornography are "solely engaged in 'impersonal' anonymous distribution by using an 'open' [peer-to-peer] program such as LimeWire, with no two-way communication between the offender who distributed and persons who obtained images or videos from the offender's computer."  U.S. Sentencing Comm'n, *Federal Child Pornography Offenses*, at 150-51 (footnote omitted) (discussing data from the Sentencing Commission's special coding project of non-production cases from fiscal year 2010).  The rate of offenders who use peer-to-peer file-sharing to access child pornography has continued to increase in recent years.  *Id*. at 166; *see also* U.S. Dep't of Justice, *The National Strategy for Child Exploitation Prevention and Interdiction: A Report to Congress* (Aug. 2010), at 14.

According to one scholar, the ease of the technology has meant that "[i]ndividuals who might not have become [child pornography] traffickers may do so after encountering the material in [peer-to-peer] networks.  Easy access to [child pornography] in [peer-to-peer] networks also may foster the proliferation of [child pornography].  Every time a [child pornography] file is downloaded, a new copy of the image is created."  Janis Wolak, *et al.*, *Measuring a Year of Child Pornography Trafficking by U.S. Computers on a Peer-to-Peer Network*, 38 Child Abuse & Neglect 347, 348-49 (2014).

Some online users may happen upon child pornography by chance.  For example, in one study, some participants exhibited a "curiosity without a fixated interest."  Krueger, *et al.*, *Sexual and Other Axis I Diagnoses of 60 Males Arrested for Crimes Against Children Involving the Internet*, *supra*, at 630.  "[M]any individuals would tend to search for all sorts of atypical pornographic images and 'drift' from one site to another, selecting child pornography as one of many new types of images or activities to explore."  *Id.*  One scholar summarized the different theories for why people start to view child pornography, stating that for some men use starts with no *mens rea*:

> [The] onset (the first deliberate viewing of child pornography) [may] occur[] *impulsively and/or out of curiosity*.  The fact that child pornography may be viewed so easily – literally with "one click" of a mouse – lends credibility to such claims.  It may be that the decision to view child pornography is simpler in a sexually aroused state; evidence indicates that sexual arousal is associated with increased risk taking behaviours and lower perceptions of negative consequences.  Still, other findings suggest that onset may occur in the absence of sexual arousal. [Two scholars] generated a fictitious website which advertised free and legal games. Visitors (N = 803) to the site found, among other things, links to explicit, or "hardcore," adult pornography. Despite visiting the site with an interest in gaming or other apparently non-sexual reasons, 457 visitors attempted to access the hardcore pornography. Admittedly, no fake links to child pornography were included in this study. Nonetheless

46

it supports the notion that *onset into child pornography might occur without prior planning or sexual arousal*.

Jeremy Prichard, *et al.*, *Internet Subcultures and Pathways to the Use of Child Pornography*, 27 Comp. Law & Security Review 585, 587 (2011) (internal quotation marks and citations omitted; emphasis added).

       The accessibility of online child pornography may also "disinhibit and desensitize people, especially to the sexualization of children.  Such easy access can spark curiosity and lead to sexual exploration that might otherwise have remained dormant or unstimulated."  Griffin-Shelley, *supra*, at 323 (citation omitted); *see also* Hannah Lena Merdian *et al.*, *The Three Dimensions of Online Child Pornography Offending*, 19 J. of Sexual Aggression 121, 124 (2013) ("perceived anonymity and de-individuation of the internet may trigger behaviours which reflect inner personal desires that are usually suppressed by social constraints") (citation omitted); Hr'g Tr., Apr. 1, 2015, at 84:14-15 (Krueger) ("People think they are looking at it and no one is looking at them.").  Chat rooms where child pornography is exchanged and discussed, may "normalize and validate sexual exploitation of children, promote the 'market' for child pornography, and may directly or indirectly encourage others to produce new images of child pornography."  U.S. Sentencing Comm'n, *Federal Child Pornography Offenses*, at 313 (footnote omitted).

       A recent finding lends support to this mistaken sense of privacy, and also to the deterrent value of some forms of monitoring:

> In November 2013, both Google and Microsoft announced that they were removing child pornographic content from their indices, filtering search results, and returning warnings when specific searches were used.  Users searching for [child pornography] on Google in the United States are provided a Google Ad warning:
>
> **Protecting children from sexual abuse**
> Child sexual abuse imagery is illegal.

> At Google we work with child protection experts to find, remove and report this material because we never want it to appear anywhere on our products, including our search results.
> To report child sexual abuse content or to find help for a child in the US, please contact the National Center for Missing & Exploited Children.
>
> Similarly, Bing returns an ad with the following warning:
>
> **Child porn, exploitative, or abusive content is illegal.**
> Get help now. . . .
>
> *The data show a precipitous drop in child pornography searches starting in July 2013, commensurate with the announcements noted above.*

Chad M.S. Steel, *Web-based Child Pornography: The Global Impact of Deterrence Efforts and its Consumption on Mobile Platforms*, 44 Child Abuse & Neglect 150, 154 (2015) (citations omitted; emphasis added).

### D. Connection between Child Pornography Consumers and Child Molesters

"[A] typical profile of child pornography offenders is missing." Jenny A.B.M. Houtepen, *et al.*, *From Child Pornography Offending to Child Sexual Abuse: A Review of Child Pornography Offender Characteristics and Risks for Cross-Over*, 19 Aggression & Violent Behavior 466, 467 (2014); *see also* U.S. Sentencing Comm'n, *Federal Child Pornography Offenses*, at 76 (noting that "[r]esearchers have attempted to classify child pornography offenders into different types based on their behavior and use of child pornography," but that "while categories can be helpful, the spectrum of child pornography offenders is not static . . . ."). It should not be ignored that child pornography offenders may include several distinct subgroups of child pornography users of varying dangerousness to children:

> Recreational users access child pornography on impulse or out of curiosity based on a penchant for pornography and a desire to look at a wide range of pornographic material. Sexual compulsive users view child pornography because of the extremeness of its content

rather than a particular preference for children. Preferential offenders mostly consist of pedophiles with a definite preference for children. Miscellaneous offenders consist of media reporters and concerned citizens who have crossed the line from investigation into offending, as well as pranksters and older teenagers attempting to sexually interact with younger teenagers. Profiteers do not necessarily enjoy looking at child pornography but rather use it for financial gain.

Jason Scheff, *Disproving the "Just Pictures" Defense: Interrogative Use of the Polygraph to Investigate Contact Sexual Offenses Committed by Child Pornography Suspects*, 68 N.Y.U. Ann. Surv. Am. L. 603, 635-36 (2013) (footnotes omitted); *see also* Seigfried-Spellar, *supra*, at 28 ("[T]he motivations and reasons are just as diverse as the user, and child pornography consumers cannot be 'lumped' into one homogenous category of offenders."); Weissler, *supra*, at 1503 ("commentators agree that *child pornography collectors are motivated by a wide number of factors and should not be viewed as a homogeneous class*.") (emphasis added).

Often, child pornography offenders are "well educated and 'well integrated in . . . society.'" Scheff, *supra*, at 609 (internal citations omitted); *see also* Krueger, *et al.*, *Sexual and Other Axis I Diagnoses of 60 Males Arrested for Crimes Against Children Involving the Internet*, *supra*, at 625 ("[C]hild pornography offenders [a]re apt to be more intelligent, better educated, and more likely to be referred by their lawyers than others . . . ."). The Internet revolution has drastically impacted the number and variety of people arrested for child pornography offenses:

[T]he population of individuals being arrested for Internet crimes against children may be substantially different from the population of individuals arrested for crimes against children in the era before the Internet. Some features of the Internet, such as anonymity or the use of a computer, may allow for individuals, who would otherwise be inhibited or embarrassed if they had to directly purchase such material or interact with minors, to engage in such illegal behaviors over the Internet.

Krueger, *et al.*, *Sexual and Other Axis I Diagnoses of 60 Males Arrested for Crimes Against Children Involving the Internet*, *supra*, at 630; *see also supra* Part V.C.

The Court of Appeals for the Second Circuit sometimes seems to have assumed that "child pornography shares a strong nexus with pedophilia" and that pedophiles use child pornography as "a model for sexual acting out with children." *U.S. v. Brand*, 467 F.3d 179, 198 (2d Cir. 2006) (internal quotation mark and citation omitted). Automatically equating non-production child pornography offenders—people who possess, acquire or distribute images of child sexual exploitation—with pedophiles or child molesters is misleading. Some "research has suggested that the motivation to collect child pornography exists along a continuum, ranging from individuals who are solely collectors, to those who collect and actively seek validation for their interests, to those who swap/trade/sell child pornography, to those who produce child pornography, to those who both collect child pornography and abduct children." Weissler, *supra*, at 1502 (footnote omitted).

Pedophilia has been defined as "a clinical psychiatric diagnosis of a persistent sexual interest in sexually immature children and can be manifested in thoughts, fantasies, urges, sexual arousal, or behavior." U.S. Sentencing Comm'n, *Federal Child Pornography Offenses*, at 73-74. "While a pedophile might sexually prefer children and fantasize about acting on these desires, without such action, he is not a child molester." Scheff, *supra*, at 637 ("To be sure, many child molesters are pedophiles and many pedophiles are child molesters, but failing to appreciate the differences between these two groups, and attributing action to nothing more than carnal desires, is a gross oversimplification.") (footnotes omitted). According to the Sentencing Commission, "not all child pornography offenders are pedophiles, and not all child pornography offenders

engage in other sex offending. While there is overlap in these categories, each is separate and none is a predicate to any other," as illustrated by the following chart:



**Figure 4–1**
**Relationship Among Child Pornography Offenders, Pedophiles, and Other Sex Offenders**
*(does not reflect actual percentages)*

*Id*. at 73 (the above graph is "merely intended to depict the[] relationships and does not attempt to show actual ratios of the various groups.").

Researchers disagree over the extent of overlap between child pornography offenders and pedophilia, as well as child pornography offenders and contact sexual offenders. *See* U.S. Sentencing Comm'n, *Federal Child Pornography Offenses*, at 75; Weissler, *supra*, at 1505-17, 1525-26. Available studies indicate that the overlap is likely to be much less than the above graph suggests. Several reports have found that, generally, child pornography offenders are "at low risk

to commit hands-on sexual assaults of children." Austin F. Lee, *et al.*, *Predicting Hands-On Child Sexual Offenses Among Possessors of Internet Child Pornography*, 18 Psych., Pol. & Law 644, 668 (2012); *see also* Merdian, *et al.*, *supra*, at 123 (summarizing studies and concluding that "[f]or most offenders, their online offending has no behavioural link to contact sex offending"); Hessick, *supra*, at 875 (noting that "the empirical literature is unable to validate the assumption that there is a causal connection between possession of child pornography and child sex abuse."). Studies have shown that:

> [W]hile child molesters may possess child pornography, those that possess child pornography are generally not likely to engage in contact offenses against children. Instead, child molesters, are merely a small subset of child pornographers. Or, another way to look at it is that child molesters and child pornography offenders are two groups with occasional overlap in membership. . . . Contrary to what may appear logical, the correlation between pedophilia and sexual contact offenses against children is not very strong.

Hamilton, *The Efficacy of Severe Child Pornography Sentencing: Empirical Validity or Political Rhetoric?*, 22 Stan. L. Pol'y Rev. 545, 580-81 (2011) (footnotes omitted).

Recent research suggests that the recidivism rate of child pornography offenders may be low, with most child pornography viewers unlikely to engage in future sexual offenses. *See* Richard B. Krueger & Meg S. Kaplan, *Non-Contact Sexual Offenses: Exhibitionism, Voyeurism, Possession of Child Pornography, and Interacting with Children Over the Internet*, ECF No. 44 (unpublished manuscript), at 51-52 (describing a 2010 study of child pornography offenders by Seto, Hanson and Babchishin which "revealed that 4.6% of online offenders committed a new sexual offense during the 1.5 to 6 year follow-up period; 2.0% committed a contact sexual offense, and 3.4% committed a new child pornography offense. The authors suggested that *there could be a distinct subgroup of online-only offenders who posed a relatively low risk of committing contact*

*sexual offenses in the future.*") (emphasis added); *see also* Sentencing Comm'n, *Federal Child Pornography Offenses*, at 310 (the Commission's recidivism study of 610 non-production offenders showed that the offenders' "*general recidivism* rate . . . was 30.0 percent during an average follow-up period of eight and one-half years after the offenders' reentry into the community" while the offenders' "known *sexual recidivism* rate, a subset of the general recidivism rate, was 3.6 percent."); *but see* Letter from Anne Gannon, Nat'l Coordinator for Child Exploitation Prevention and Interdiction, Office of the Deputy Attorney General, U.S. Dep't of Justice, to Honorable Patti B. Saris, Chair, United States Sentencing Comm'n, (Mar. 5, 2013) (taking issue with the Commission's finding that "the recidivism rate of child pornography offenders is not particularly high compared to other offenders," because "there is currently no valid risk assessment instrument applicable to child pornography offenders, and the existing data and literature do not support the assertion that recidivism rates for child pornography offenders are overstated.").

Failing to distinguish between different categories of child pornography offenders may unintentionally harm children by obfuscating the underlying crucial problem of child sexual abuse:

> Concentrating on the presumptive harms of child pornography, both in the restitution context and in the criminal justice system as a whole, has ramifications that extend beyond the incorrect assumption that child pornography viewers are also child sexual abusers. By focusing on individuals who have a relatively small chance of committing hands-on child sexual abuse, law enforcement officials, judges, and legislators neglect the far more common scenario in which children are sexually abused by people they already know. Indeed, the sexual abuse portrayed in the vast majority of child pornography was committed and filmed by the child's father, uncle, family member, or close family friend, i.e., someone within the child's circle of trust. . . .
>
> Instead of addressing the complexities of sexual abuse within families, *the existing approaches to child pornography perpetuate*

> *an illusion of the typical child sex abuser, a "sexual predator" living completely outside of normal society. . . .* Courts also employ the term sexual predator with regularity, implicitly keeping the focus on strangers rather than family members.

Cortney E. Lollar, *Child Pornography and the Restitution Revolution*, 103 J. of Crim. Law & Criminology 343, 375-76 (2013) (emphasis added) ("Eighty-six percent of child sexual abuse victims are abused by someone they already know. More than 96% of child pornography victims already know the person who is filming and producing the images of their sexual abuse.") (footnotes omitted); *see also* Carissa Byrne Hessick, *Disentangling Child Pornography from Child Sex Abuse*, 88 Wash. U. L. Rev. 853, 888-90 (2011) ("One of the most pervasive misperceptions about child sex abuse is that it is a crime perpetrated by strangers."). The most serious dangers to children are from persons they know rather than from anonymous pornography viewers. As one scholar noted:

> [T]he unfortunate reality is that child sex abuse is often a messy intrafamilial problem. And when prosecutors try to bring cases of child sex abuse against, for example, a child's relative or a friend of the family, they will sometimes find that the family members side with the offender, rather than with the victim. Those who possess child pornography do not present such problems. They often possess pictures of children they have never met. And when we engage in preventative or proxy punishment, we can do so without asking who took the pictures of the children or which children are at risk. Because *pornography convictions do not require an acknowledgement of the ugliness associated with non-stranger sex abuse*, society may prefer to punish those who possess child pornography over those who abuse children. *Punishing pornography (as opposed to contact offenses) allows us to persist in our misconception that children are at risk of sex abuse from a stranger looking at pictures on a computer rather than from the children's own circles of family and friends*.

*Id*. at 888-89 (footnote omitted; emphasis added).

By focusing on child pornography offenders, "modern practices have resulted in some *defendants who possess child pornography receiving longer sentences than defendants who sexually abuse children.*" *Id.* at 860 (footnote omitted; emphasis added); *see also U.S. v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) ("The irony of the court's conclusion in this area . . . is that the Guidelines actually punish some forms of direct sexual contact with minors *more leniently* than possession or distribution of child pornography.").

### E.  Child Pornography's Continued Harm to Children

Although non-production child pornography offenders often are not the perpetrators of direct sexual abuse of minors, actual children have been seriously injured in the production of those images.  By viewing them and contributing to their distribution, child pornography offenders perpetuate harm.  The Department of Justice explained:

> The vast majority of children who appear in child pornography have not been abducted or physically forced to participate.  In most cases they know the producer—it may even be their father—and are manipulated into taking part by more subtle means.  Nevertheless, to be the subject of child pornography can have devastating physical, social, and psychological effects on children. The children portrayed in child pornography are first victimized when their abuse is perpetrated and recorded.  They are further victimized each time that record is accessed. In one study, 100 victims of child pornography were interviewed about the effects of their exploitation—at the time it occurred and in later years.  Referring to when the abuse was taking place, victims described the physical pain (e.g., around the genitals), accompanying somatic symptoms (such as headaches, loss of appetite, and sleeplessness), and feelings of psychological distress (emotional isolation, anxiety, and fear). However, most also felt a pressure to cooperate with the offender and not to disclose the offense, both out of loyalty to the offender and a sense of shame about their own behavior. Only five cases were ultimately reported to authorities. In later years, the victims reported that initial feelings of shame and anxiety did not fade but intensified to feelings of deep despair, worthlessness, and hopelessness. Their experience had provided them with a distorted model of sexuality,

and many had particular difficulties in establishing and maintaining healthy emotional and sexual relationships.

Wortley & Smallbone, *supra*, at 17-18 (footnotes omitted). "[C]hild pornography creates a permanent record of the abuse, which may trouble victims for the rest of their lives." Henzey, *supra*, at 8; *see also New York v. Ferber*, 458 U.S. 747, 759 (1982) ("[The] materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation.") (footnote omitted); U.S. Sentencing Comm'n, *Federal Child Pornography Offenses*, at 311 ("Child pornography offenses inherently involve the sexual abuse and exploitation of children. Victims are harmed initially during the production of child pornography, but the perpetual nature of the distribution of images on the Internet causes a significant, separate, and continuing harm to victims.").

### F. Effects of Excessive Punishment on Defendants and Families

The court has received many letters from defendants, their families, and concerned persons regarding the effects and appropriateness of punishment, including lengthy prison sentences and strict sex offender registration requirements, in what are essentially non-production child pornography cases. A sampling of excerpts from those letters follows:

A woman wrote:

> [T]here is no evidence that these individuals can be rehabilitated, and who would fund treatment programs and oversee them? How do you know whether they pose a threat to society? . . .
>
> More importantly, what about the lives of the millions of innocent young victims who are forced to pose in child pornography or to perform unthinkable sex acts? Child pornography is the vilest form of child abuse on our planet . . . . [M]en who foster and encourage the sexual exploitation of children by viewing child pornography should be far more severely penalized! . . .
>
> Would you be comfortable allowing a man who views and downloads child pornography to babysit your granddaughter or

grandson? It is impossible to document the danger that these men pose to society because the viewing and downloading of this material is done in the privacy of their homes and there are no valid statistics that correlate the viewing of child pornography with the perpetration of a sexual assault on a child. That does not mean that a correlation does not exist. Again, should we not err on the side of the child? . . .

It would be far more honorable to defend the rights of the innocent than condone the vile criminal actions of sex offenders, which include the viewing of child pornography, let alone its downloading and circulation.

Letter from G. K. G., May 22, 2010, filed in *United States v. Polouizzi*, No. 6-CR-22, ECF No. 241.

A mother wrote:

Like many young men, our son used the internet to download adult pornography on Lime Wire along with those images, child pornography was attached. We clearly do not condone his actions and agree that a punishment was in order. Our son received 8 years in a federal prison and will be on a sex offender registry the rest of his life. He faced 25 years in prison because he downloaded to a shared file sharing peer to peer [site].

The internet has changed the world and certainly changed the availability of child pornography. It is unfortunate most of these images can be viewed without economic exchange, thus debunking the supply/demand argument. The problem with this issue is similar to all sex offender issues: the irrational application of a broad brush without looking for context.

Letter from R.F., Oct. 25, 2013, filed in *United States v. Polouizzi*, No. 6-CR-22, ECF No. 364-1.

A father wrote:

I have a son who is currently serving an eight year sentence for viewing and possessing child pornography. He never in any way encouraged or promoted the actual commission of the acts themselves nor did he intentionally promote or distribute the videos to others. A psychologist found that he did not constitute a danger to others and there was absolutely no evidence to the contrary. He is not now, nor has he ever been a danger to society. The offen[s]e(s) occurred when he was in his teens. While I do not

condone his actions in any way, it was basically a teenager doing something very stupid. In his case, as well as in many others, the end result has been to spend millions (if not billions) of dollars without making our society any safer (and in many case[s] it could actually have just the opposite effect). . . .

While protection of our society is extremely important, punishments which (a) do not add anything to protecting society; (b) have reasonable alternatives which would do so; and (c) are a very expensive and unnecessary burden on taxpayers are, simply, without any basis in fact or in reason.

Letter from R. W. F., Oct. 1, 2013, filed in *United States v. Polouizzi*, No. 6-CR-22, ECF No. 358-1.

Another father wrote:

My son took a plea deal and received a 5 year mandatory minimum sentence for having 2 video[]s and a picture of underage teens. He was also charged with distribution due to the peer to peer site.

He was working in a think tank in D.C. and had become a policy expert in Southeast Asia politics. He has a Graduate degree in International Relations and . . . his life has been destroyed and will have to register as a sex offender.

He took a polygraph test from a former FBI agent to determine if he had any inappropriate contact with anyone under or over the legal age. He passed. He had a psychological exam to determine if he was a pedophile or a predator[.] [H]e was neither.

[The Federal Judge] challenged the prosecution in the plea deal. She asked them why a better deal hadn't been reached. "This is a young man with no previous history except for this one mistake and this is the best you could do?" . . .

Our family has been devastated by this incident. It is difficult to talk to people because they just assume if someone looked at [child pornography] then they must be a pedophile. Research has shown that is not the case. People just don't know what they don't know.

Letter from B. H., undated, filed in *United States v. Polouizzi*, No. 6-CR-22, ECF No. 357-1.

A mother wrote:

58

I am writing to you on behalf of my son [D.G.] and the sentence he received. . . . He was sentenced on March 5, 2009 on One count of Receipt of child pornography. He was committed to the custody of the Bureau of Prisons to be imprisoned for a total term of TWO HUNDRED TEN MONTHS which is 17 ½ years for Receiving. . . . He never hurt or touched anyone and yet he got sentenced worse than some murderers or rapist[s]. We have not heard of anyone else with 1 count of receiving get this much time. . . .

My son kept saying he never ask[ed] for what he received . . . . Someone has to look into this Limewire and stop them from sending things people don't ask for because it can get them put in prison. . . . He has never hurt anyone. He is forty years old. He lived in Virginia. He was in the United States Air Force during [Desert] Storm for four years and after he was honorably discharged from there, he was in the reserves for two years. He worked on the electronics for air planes before that. . . .

[D.G.] has lost his job, his home, and his life is ruined. [D.G.] is a good person. He has never been in any trouble with the law. He worked his way through college. . . .

In jail, he was beaten up three times and left with a scar on his forehead from seven stitches and he was strangled once by another inmate. Now in Texarkana prison he was repeatedly kicked because the inmates found out what his charges were. He says he never fought back he just told a guard. He can't fight back with one hand. He wears a brace on that hand. He is not a violent person but, for Receiving he has to struggle to survive every day and night. If you are not a violent offender when you go into prison, you are when you come out. I truly do not know how he has survived so many months and has so many more years to go for 1 count of receiving. He will be on a list for the rest of his life, will have to tell a job what he was in prison for. How many jobs will hire someone like that??

Letter from S. G., June 30, 2010, filed in *United States v. Polouizzi*, No. 6-CR-22, ECF No. 269-2.

A pastor, apparently not personally impacted by the issue, wrote:

While I still think it is abnormal for any one to view pornography, I have always felt that the sentences and resources used to entrap these individuals were excessive. As long as possession does not lead to any action that can violate a child, I do not see any crime simply in viewing.

Letter from Rev. A. M. S., Jan. 17, 2011, filed in *United States v. Polouizzi*, No. ECF No. 300.

> A brother wrote:

>> My brother-in-law is currently serving a mandatory 5 year sentence for receipt of child pornography. He pleaded guilty, and forwent legitimate defenses, to avoid the possibility of an embarrassing trial and a 10 year sentence.

>> Only after his arrest did we learn my brother-in-law had an addiction that began in his teenage years. He was a well-respected real estate attorney and partner in a prestigious law firm. He lost his license to practice law, all contact with his ex-wife and daughter and most of his possessions. He has spent the last 4 years in a low security facility, working on the painting crew. . . .

>> My brother-in-law paid a huge price even prior to his incarceration. . . . I come away from this experience with a profound sense of waste. My brother-in-law contributed to society as a good parent, with his skills that helped build commercial development and through payment of significant tax dollars. Society has not benefitted or been protected by incarcerating him, isolating him from his family, failing to utilize his talents and denying itself the tax revenues he is capable of producing.

>> I certainly don't condone child pornography. . . . [T]he abusers of children are not being punished and are probably not even in this country. I cannot, however, agree with a law that . . . unnecessarily destroys lives and places people in prison when treatment and supervision would allow for rehabilitation. I doubt any member of Congress who desires to be re-elected will stand on the chamber floor and argue that we should soften the laws on child pornography, but we need to have a more sensible approach to this problem.

Letter from J. D. P., June 8, 2010, filed in *United States v. Polouizzi*, No. 6-CR-22, ECF No. 254-2.

The letters exemplify the serious adverse collateral consequences that incarceration of a parent or child can have on the family unit. "Incarceration of a parent normally causes major negative economic, social and psychological consequences to the child, and may have life-long [adverse] repercussions." Michal Gilad, *The Young and the Helpless: Re-Defining the Term*

"*Child Victim of Crime*" (U. Penn. L. Sch., Working Paper No. 14-23, 2014), at 31-32; *cf.* Jean C. Lawrence, *ASFA in the Age of Mass Incarceration: Go to Prison—Lose Your Child?* 40 Wm. Mitchell L. Rev. 990, 1002-03 (2014) (noting that "the Center for Disease Control has determined that parental incarceration is an 'adverse childhood experience' (ACE) that 'significantly increases the likelihood of long-term negative outcomes for children.'") (footnote omitted); Sarah Abramowicz, *Beyond Family Law*, 63 Case W. Res. L. Rev. 293, 321 (2012) (footnotes omitted) ("[C]hildren separated from their parents suffer developmental harm as well, often in the form of behavioral and educational difficulties."); *see also United States v. Bannister*, 786 F. Supp. 2d 617, 653-55 (E.D.N.Y. 2011) (collecting literature and discussing effect of incarceration on family and community).

The court received an unsolicited letter from a psychologist, who detailed the effect of charges of receipt of child pornography on the family of one of her patients:

> For many decades I worked as a psychologist with children who had been separated from their parents and know the heavy price they pay. Recently I became aware of a father who received three pictures of child pornography on his computer and was convicted of this charge. He has been under house arrest for over two years and will begin a two year prison term in July.
>
> The family consists of mother, father, a biological son of ten and a six year old boy in the process of being adopted. The older child will soon be told of his father's impending incarceration. He will be devastated. The younger child has neurological deficits for which he has received excellent attention. He has lived with this family since infancy and he will be both devastated and confused. His adoption may be in jeopardy.
>
> Family resources have been decimated because of job loss and legal fees, the marriage has suffered, and soon the children will be without a father for two years. Their father has neither inappropriately touched nor abused children and has been a consistently nurturing presence in the life of his sons. Their mother works hard to provide for the financial, medical and emotional needs of the family.

Letter from J. M. D., May 31, 2010, filed in *United States v. Polouizzi*, No. 6-CR-22, ECF No. 249-3.

A lady wrote:

> I am a loved one of a gentleman that was convicted on a felony-child pornography charge. . . .
>
> My loved one has had his life torn apart because of his arrest and conviction.  He has lost his marriage, his children, and had his professional credentials scrutinized with possibility of reprimand or license removal.  He was investigated for 9 months and was found to have 3 images on his computer, which had come from a site claiming to have only women of legal age represented.  He fought hard to be handed a class 3 felony and 2 1/2 years of probation, 5 years ago by the state attorney's office.  However, as a resident of Illinois, he is now required to be a registered sex offender for his natural lifetime.  This registration requirement changed from 10 years to natural lifetime, while his sentencing and case were being processed.
>
> This man is not a monster; in fact, he is intelligent, professional, honest, kind, a father, and law abiding.  He had no prior issues with the law and is diligent to not have any since.  He was a man who made a mistake, but will never be able to live it down.

Letter from D. D., July 7, 2010, filed in *United States v. Polouizzi*, No. 6-CR-22, ECF No. 268-2.

One convicted child pornography offender wrote:

> Even though I never created, produced, photographed distributed or had any part in making any material, the prosecutor's claim is that since I downloaded it from a peer to peer network called Shareza, that constitutes reproducing which constitutes the pandering charges. . . .
>
> There isn't a day that goes by that I don't think that it would be better if I just killed myself.  I have a wife and five children whom I love very much.  I can't help but think that they would be better off without me around to bring them down with all of this.  However, I keep being reminded that my kids need a dad and what would they do if I were gone forever.  It is hard enough on them right now and I've been away from them for a couple of months. . . .

The media destroys you and doesn't care about reporting the whole story, just what will make sensational headlines. I had an eighty thousand dollar a year job that was gone in an instant when the story hit the airwaves. I had not even been to court yet or convicted. Just the accusation was enough in their eyes. Even though we don't have everything we once had, we have all stuck together through this and plan on getting through this whole ordeal together. . . .

In August of this year, I was taken to the county jail and on my first day there, three guys came into my cell stating that they saw me on the news and they were going to get me. My cell was locked down but on the fourth day I had returned to my cell after lunch and laid down. Central forgot to lock the cell so . . . those three came in and beat me up. All three of them were in for murder. It is pretty bad that I am looked at worse than a murderer when I never touched a child or ever intended to touch a child. I downloaded from the internet while one of these men killed his girlfriend then enlisted his friends to help him cut up her body and scatter the parts in Kentucky. Yet after the media attention, society feels I deserve this and worse. The comments people left about the articles ha[ve] really scared my wife. . . .

I have no criminal record, did not use any type of drug, and have worked hard to support my family. I have five wonderful children that depend on me and would be hurt the most if I am sentenced to prison. My wife will have a difficult time raising and supporting them if I am in prison. She has already had to deal with so much from this. She has had to face community ridicule for standing by me and virtual strangers demanding to know why she didn't immediately leave me.

Letter from D. L., undated, filed in *United States v. Polouizzi*, No. 6-CR-22, ECF No. 347-1.

A mother wrote:

[M]y son was sentenced to a fifteen year federal mandatory minimum sentence for possession of child pornography. At first the stuff came attached to a movie he was downloading from a site called Limewire. He couldn't delete it. He tried. Instead he did something stupid, he found it useful to bargain for movies he wanted. That was in 2003. When the North Carolina SBI came to his home, confiscated his computer and all his CDs, they suggested he get an attorney. He did. Absolutely nothing happened until five years later when he was living with me in NJ. During that five year period, he continued to work, care for his children and go about his

day to day business. His company folded, he lost his job and he checked with the attorney to see if it would be okay to move to NJ to find better employment and be with family. Not a problem because there were no charges and he had never been arrested. Then one early morning a group of five federal marshals burst into my home, arrested him on a federal warrant that had been issued a day or so before, and he was taken to Newark to be charged and indicted on possession of child pornography. . . .

He has a wife and 2 children here in NJ, the oldest child is autistic attending a special school. On September 10, 2009 he went before a federal judge in Newark . . . . She had reviewed his case, noted no prior trouble with the law, noted a psychological evaluation by a prominent psychologist . . . who works with sex offenders and testifies regularly, and who found that [my son] did not fit the profile of a pedophile and would not in his professional opinion reoffend. She noted all the family support he had as we were all there for him. She indicated that she didn't quite understand the technical aspects of the charges, but she was bound by a federal guideline of sentencing to fifteen years, no parole, nothing. She recommended his time be served in NJ or PA so family could keep in touch. Again this is a man, 43, who spent his married life devoted to his children, his family and his work and was now being sent away for fifteen years because of a mandatory minimum sentence that doesn't allow a judge to change a federal mandatory minimum, nor to take into consideration all the extenuating circumstances. His wife and children are now on public assistance at NJ expense. They are living with me to keep them together. He was soon sent from Newark, Essex County Prison to [the Metropolitan Detention Center] in Brooklyn where he waited until there was an opening hopefully in Fort Dix, here in NJ. Well, would you believe he was first sent to a county prison in Oklahoma where he sat for a few days before being sent to his final destination in Bastrop FCI in Bastrop, Texas. Now he was told he had to "earn" his way back to NJ.

Letter from S. C., June 25, 2010, filed in *United States v. Polouizzi*, No. 6-CR-22, ECF No. 264-3.

Upon release from prison, many inmates "have a difficult time reestablishing their relationships with their children." Jenni Vainik, *The Reproductive and Parental Rights of Incarcerated Mothers*, 46 Fam. Ct. Rev. 670, 680 (2008) (footnote omitted); *see also United States*

*v. G.L.*, 305 F.R.D. 47, 50 (E.D.N.Y. 2015). Reconnecting with family and loved ones may be particularly hard for convicted sex offenders, because of the stigma associated with the offense as well as the strict restrictions imposed upon release. *See* 42 U.S.C. § 16913 (federal sex offender registration and notification requirements); 18 U.S.C. § 3583(k) (supervised release term for federal sex offenders); *see also* N.Y. Correct. Law § 168 *et seq.* (New York state's sex offender registration act may also apply to federal child pornography offenders residing in New York state pursuant to § 168-a (2)(d)(iii)).

A mother wrote:

> I write as the mother of a young man (20 years old at the time of his single offense) convicted of 1 count of possession of child pornography. That was 7 years ago, and he has served his sentence (4 years) and completed his supervised release (3 years) and his court-ordered "therapy." He struggles day-to-day to find work, housing, to maintain his sense of self-worth, his dignity, to find some hope for the future for himself and his lovely new bride. He is held back enormously because he is on the public registry.
>
> I don't excuse what he did, I never did, and neither does he. But I believe . . . that there is an enormous difference between viewing [child pornography] obtained via file sharing by naïve young men and the actual, intentional molestation/abuse of a child. I know many, many other mothers of sons like my own; good kids who were guilty of hubris, of a lack of empathy, of an unhealthy curiosity and in most cases, an obsession with pornography of all types that took them places they should not have gone. NONE of the young men I know ever touched a child.

Letter from R. G. R., Oct. 1, 2013, filed in *United States v. Polouizzi*, No. 6-CR-22, ECF No. 360-1.

The parents of a young man incarcerated for downloading child pornography wrote:

> We are writing to you today to share our story and the story of many like us that have been impacted under the Federal Guidelines for possession of child pornography. We do not in any way condone the exploitation of children.

Our story is similar to so many across the country. Our son downloaded child pornography to a shared file from Lime Wire. He did not actively send these images, pay for them, have contact or have any prior convictions. He received an 8-year sentence under enhancement guidelines. We fully understand what our son did was wrong. Yet, it does not seem in any way productive to my son's psychological betterment to undergo 8 years of imprisonment. There will be nothing that can change the pain and shame of what our son viewed. The void in our lives cannot be described. It has been two years since his incarceration and we ache for the day we can be a family again.

Many others have husbands incarcerated for lengthy sentences who actually fear reuniting with their families when released. As permanent felons and permanently registered sex offenders with residency and employment restrictions, they fear imposing additional burdens, shame, and subsequent trauma on their wives and children by living under the same roof. This extinguishes any possible pathway to repairing these marriages and families.

Until reunited with our loved ones, we are dedicated to putting our energies into preventing others from going through this hell alone[.]

Letter from H. F. and R. F., Feb. 3, 2011, filed in *United States v. Polouizzi*, No. 6-CR-22, ECF No. 315-2.

A convict revealed:

I am currently in the federal prison in Forrest City, Arkansas serving a 51-month federal sentence and a 7-year Missouri sentence for possession of child pornography. . . .

At the same time, my conditions upon release are like a sentence by themselves. When I leave the Federal Bureau of Prisons, I shall have lifetime supervised release, for which I shall have to pay; I shall never be allowed, even for work or school, to use a computer or any device with Internet, and I shall need to register as a sex offender both in the State of Missouri's and the national registry. Of course, with the recent Supreme Court ruling that sex offenders can be detained [indefinitely], I may not have to worry about being released.

To me, it seems like the thousands of men in my position will have great difficulties in their effort to return to society. In my case, I was a university Spanish instructor for three years and am interested

in earning a doctoral degree in order to get my life back on track. Unfortunately, that is impossible without the use of a computer. I cannot think of many careers for which I am still eligible, and I know others in the same situation.

Letter from P. L., undated, filed in *United States v. Polouizzi*, No. 6-CR-22, ECF No. 271-2.

## VI. Sentencing Law

### A. Discretion of Sentencing Judge in Determining Appropriate Punishment

A high degree of discretion is possessed by the sentencing judge in determining appropriate punishment. *See, e.g.*, *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc) ("A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime."). It is the sentencing court that "is in the best position to judge the appropriateness of a sentencing departure in light of the defendant's overall history and character, his remorse or lack of it, and other factors bearing on the sentence to be imposed." *United States v. Crowley*, 318 F.3d 401, 421 (2d Cir. 2003); *see also United States v. D.M.*, 942 F. Supp. 2d 327, 341 (E.D.N.Y. 2013).

### B. Applicable Statute

As already noted, defendant pled guilty to possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B):

> Any person who . . . knowingly possesses, or knowingly accesses with intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce . . . by any means including by computer, if – (i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and (ii) such visual depiction is of such conduct[.]

Because defendant was convicted of a crime of possession of child pornography (rather than one of production, receipt or distribution), no statutory minimum mandatory term of

imprisonment is applicable.  *See* 18 U.S.C. § 2252(b)(2) (2012).  The maximum term in prison is twenty years if the person depicted is under twelve years old.  *Id.*  He is subject to a minimum term of supervised release of five years.  18 U.S.C. § 3583(k) (2015).

In the absence of a mandatory statutory minimum sentence, a district court must consider a variety of factors when determining the appropriate punishment.  *See, e.g.*, *Ewing v. Cal.*, 538 U.S. 11, 34-35 (2003) (Stevens, J., dissenting) ("[B]efore guideline sentencing became so prevalent[,] . . . sentencing judges wisely employed a proportionality principle that took into account all of the justifications for punishment—namely, deterrence, incapacitation, retribution, and rehabilitation.").

### C.  Advisory Nature of the Sentencing Guidelines

A district court determines the applicable sentencing range pursuant to the United States Sentencing Commission Guidelines ("Guidelines").  *See Dorvee*, 616 F.3d at 180 (citing *Gall v. United States*, 552 U.S. 38, 39 (2007)).  In *United States v. Booker*, the Supreme Court determined that the Guidelines are advisory.  543 U.S. 220, 245-46 (2005).  Although no longer mandatory, the Guidelines' sentencing ranges continue to function as "the starting point and the initial benchmark" for all sentencing proceedings.  *See Gall*, 552 U.S. at 46, 49 (noting that the Guidelines are presumed to be "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions").  Even if advisory only, the Guidelines must be given "respectful consideration" by the sentencing court.  *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

### 1.  Section 3553(a) Factors

After consulting the Guidelines, a sentencing court performs an "individualized assessment" of the situation.  *Gall*, 552 U.S. at 50.  This analysis is guided by "[r]easonableness"

and an "individualized application of the statutory sentencing factors" listed in section 3553(a) of the United States Code, Title 18. *See Dorvee*, 616 F.3d at 184 (citing *Gall*, 552 U.S. at 46-47); *Kimbrough*, 552 U.S. at 113 (Scalia, J., concurring) ("[T]he district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines.").

In view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, society and our economy, justifiable frugality in incarceration is prized. *See, e.g.*, Nat'l Res. Council of the Nat'l Academies, *The Growth of Incarceration in the United States, Exploring Causes and Consequences*, 8 (2014) ("*Parsimony*: the period of confinement should be sufficient but not greater than necessary to achieve the goals of sentencing policy."). Pursuant to the "parsimony clause" in section 3553(a), a court is to "impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth" at section 3553(a)(2). 18 U.S.C. § 3553(a); *see also Dorvee*, 616 F.3d at 182.

Section 3553(a) includes a list of "factors" a court is to consider when determining the appropriate sentence ("the § 3553(a) factors"). They are as follows:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law; and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and
> >
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [by the Guidelines;]

(5) any pertinent policy statements [issued by the Sentencing Commission;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

## 2. Departures Based on Section 3553(b)(2) Factors

Although no longer mandatory, 18 U.S.C. § 3553(b)(2) provides guidance on instances in which district courts may upwardly or downwardly depart from the Guidelines for crimes relating to children or sexual offenses. *See United States v. Selioutsky*, 409 F.3d 114, 116-17 (2d Cir. 2005) (considering the excising of § 3553(b)(2) under the rationale set forth in *Booker*).

Under § 3553(b)(2), sentencing courts may upwardly depart from the Guidelines if "there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence greater than that described." 18 U.S.C. § 3553(b)(2)(A)(i); *see also* U.S.S.G. § 5K2.0(a)(1)(B).

According to § 3553(b)(2), sentencing courts may downwardly depart from the Guidelines, in addition to refusing to follow them, if:

(ii) the court finds that there exists a mitigating circumstance of a kind or to a degree, that—

(I)     has been affirmatively and specifically identified as a permissible ground of downward departure in the sentencing guidelines or policy statements issued

under section 994(a) of title 28, taking account of any amendments to such sentencing guidelines or policy statements by Congress;

(II)     has not been taken into consideration by the Sentencing Commission in formulating the guidelines; and

(III)    should result in a sentence different from that described; or

(iii) the court finds, on motion of the Government, that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense and that this assistance established a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence lower than that described.

18 U.S.C. §§ 3553(b)(2)(A)(ii)-(iii).

### 3.  Departures Based on Disagreement with Commission Policy

A sentencing court need not follow the sentencing range suggested by the Guidelines if it disagrees with a relevant policy reflected in the Guidelines. *See Spears v. United States*, 555 U.S. 261, 264 (2009) (stating that "the point of *Kimbrough*" was to "recogni[ze] [the] district courts' authority to vary from the crack cocaine Guidelines based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case"). This authority "is at its greatest when the offense Guideline at issue is not the product of the Commission's empirical analysis and technical expertise." *United States v. Diaz*, No. 11-CR-821, 2013 WL 322243, at *3 (E.D.N.Y. Jan. 28, 2013). This is the case with respect to the Guidelines for child pornography offenses, which were amended at the direction of Congress rather than through the Sentencing Commission's empirical approach. *See Dorvee*, 616 F.3d at 184-86. The Commission opposed some changes to the Guidelines directed by Congress and has sought authority from Congress to amend the current child pornography provisions. *See id.* at 185;

71

U.S. Sentencing Comm'n, *Federal Child Pornography Offenses*, at 322 ("[T]he Commission believes that Congress should enact legislation providing the Commission with express authority to amend the current guideline provisions that were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines.").

### 4. Departures:  Statement of Reasons Required

A sentencing court shall "state in open court the reasons for its imposition of the particular sentence."  18 U.S.C. § 3553(c).  If the sentence is not of the kind prescribed by, or is outside the range of, the Guidelines referred to in section 3553(a)(4), the court shall indicate the specific reasons for imposing a sentence different from the Guidelines.  18 U.S.C. § 3553(c)(2).  These "reasons must also be stated with specificity in a statement of reasons form."  *Id.*  Even though, pursuant to *Booker*, the Guidelines are no longer mandatory, the sentencing court must still adhere to the requirements of section 3553(c)(2).  *United States v. Jones*, 460 F.3d 191, 196-97 (2d Cir. 2006).

The sentencing court's written statement of reasons shall be "a simple, fact-specific statement explaining why the Guidelines range did not account for a specific factor or factors under § 3553(a)."  *United States v. Rattoballi*, 452 F.3d 127, 138 (2d Cir. 2006), *abrogated in part on other grounds by Kimbrough v. United States*, 552 U.S. 85 (2007).  A statement should demonstrate that the court "considered the parties' arguments and that it has a reasoned basis for exercising its own legal decision-making authority."  *Cavera*, 550 F.3d at 193 (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007)) (internal alterations omitted).

### D. Restitution

Pursuant to 18 U.S.C. § 2259, victims of certain child exploitation offenses, including possession of child pornography, are entitled to mandatory restitution.  The statute provides, in

relevant part, that the order of restitution "shall direct the defendant to pay the victim (through the appropriate court mechanism) the full amount of the victim's losses." 18 U.S.C. § 2259(b)(1).

> The term "full amount of the victim's losses" includes any costs incurred by the victim for: (A) medical services relating to physical, psychiatric, or psychological care; (B) physical and occupational therapy or rehabilitation; (C) necessary transportation, temporary housing, and child care expenses; (D) lost income; (E) attorney's fees, as well as other costs incurred; and (F) any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(b)(3).

In *Paroline v. United States*, the Supreme Court addressed the question of how to determine the proper amount of restitution that "a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed." 134 S. Ct. 1710, 1716 (2014). The Court held that "[r]estitution is . . . proper under § 2259 only to the extent the defendant's offense proximately caused a victim's losses." *Paroline*, 134 S. Ct. at 1722. The Court then determined that, in a case in which a defendant possesses images of a victim and the

> victim has outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant[,] . . . a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses.

*Id.* at 1727. In a case like *Paroline*, where the defendant possessed two images of "Amy"—the victim seeking restitution—and was one of potentially thousands of people possessing her images, the Court noted that although any award should not be "a token or nominal amount," restitution "would not be severe . . . given the [weak] nature of the causal connection between the conduct of a possessor like Paroline and the entirety of the victim's general losses from the trade in her images, which are the product of the acts of thousands of offenders." *Id.*

In terms of how courts should go about calculating such an award, the Court noted that "[t]his cannot be a precise mathematical inquiry and involves the use of discretion and sound judgment." *Id*. at 1728. Specifically, a court should "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses." *Id*. at 1727-28. As a starting point, the Court suggested that district courts "determine the amount of the victim's losses caused by the continuing traffic in the victim's images," and "then set an award of restitution in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses." *Id*. at 1728. The Court then identified a variety of factors that district courts could take into consideration when determining proper restitution, including:

> [T]he number of past criminal defendants found to have contributed to the victim's general losses; reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses; any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted); whether the defendant reproduced or distributed images of the victim; whether the defendant had any connection to the initial production of the images; how many images of the victim the defendant possessed; and other facts relevant to the defendant's causal role.

*Id*.

The Supreme Court cautioned that "[t]hese factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders." *Id*. Rather, the factors are to serve as "rough guideposts for determining an amount that fits the offense." *Id*.

**VII.     Application of Law to Facts**

**A.  Guidelines Sentencing Range**

The total Guidelines offense level is 28.  The criminal history category is I, yielding a Guidelines imprisonment range of 78-97 months.  U.S.S.G. ch. 5, pt. A (Nov. 2014); *see also* Sent. Hr'g.  The offense level was calculated by the probation department as follows:

- Base offense level of 18 pursuant to U.S.S.G. § 2G2.2;

- Two-level enhancement because the material involved a prepubescent minor who had not attained the age of 12 years old, pursuant to U.S.S.G. § 2G2.2(b)(2);

- Four-level enhancement because it was deemed that the offense involved the portrayal of sadistic and/or masochistic conduct or other depictions of violence, pursuant to U.S.S.G. § 2G2.2(b)(4);

- Two-level enhancement because the offense involved the use of a computer or interactive computer service, pursuant to U.S.S.G. § 2G2.2(b)(6);

- Five-level enhancement because the offense involved 22 videos (amounting to 1,650 images) and 9 still images for a total of 1,659 images, pursuant to U.S.S.G. § 2G2.2(b)(7)(D);

- Two-level reduction because defendant demonstrated acceptance of responsibility for the offense, pursuant to U.S.S.G. § 3E1.1(a);

- One-level reduction because the government was informed in a timely manner of defendant's intention to plead guilty, pursuant to U.S.S.G. § 3E1.1(b).

PSR at 5-6.

The probation department viewed the sentencing range provided under the Guidelines as excessive and recommended a sentence of 24 months in custody with a term of five years of supervised release.  U.S. Prob. Dep't Sent. Rec., Oct. 17, 2014 (sealed), at 3.

**B.  Analysis of Section 3553(a) Factors**

A sentencing court is required to carry out an individualized assessment in order to reach a sentence that is "sufficient, but not greater than necessary, to comply" with the requirements of the § 3553(a) factors.  18 U.S.C. § 3553(a).

**1.  Nature and Circumstances of Offense; History and Characteristics of Defendant**

The individual circumstances of the case were analyzed, including the nature of the offense and the history and characteristics of the defendant.  A non-incarceratory sentence is appropriate.  Defendant is a father to three young children who would be severely adversely affected if he were incarcerated.  ACS conducted an investigation and concluded there was no evidence that any of R.V.'s children had been abused by him.  *See supra* Part II.F.  Upon completion of the study, defendant was permitted by New York's Family Court to return home to reside with his family on August 29, 2014.  PSR at ¶ 11; Sent. Mem., Apr. 9, 2015, ECF No. 43 (sealed), at 1 and Ex. D; Hr'g Tr., Apr. 1, 2015, 94:18-20.  The family court petition was dismissed on May 6, 2015.  Letter update as to [R.V.], June 10, 2015, ECF No. 51 (sealed).

The expert, Dr. Krueger, testified that, in his opinion, not only could his children safely live with R.V., but they would be negatively affected if they were to be separated from their father:

> It is my opinion, to a reasonable degree of medical certainty, that [R.V.] could live with his family without placing his children at risk. Indeed, given the negative effects of this separation from his children, it is my opinion that it would be in the children's best interest to be reunited with them.

Krueger Letter at 12; *see also* Hr'g Tr., Apr. 1, 2015, at 63:16-18; *supra* Part III.A.3.b.  Ms. Guevara, a social worker, also testified that the defendant belongs to a strong family unit and his children would suffer from his absence.  *See supra* Part III.B; Hr'g Tr., Apr. 1, 2015, at 19:19-21; Family Assessment at 6 ("[R.V.'s] presence and participation in the home is vital to this family's healing and progress . . . .").

Defendant has expressed sincere remorse for his actions and has fully participated in treatment, making adequate progress.  *See supra* Part II.E.  His treatment provider noted that, given R.V.'s "commitment to treatment and his ability to work on improving his recognition of his personal high risk factors he appears capable [of] maintaining a non-relapse behavior."  Mustard Seed Client Compliance Report, Apr. 1, 2015, Ct. Ex. 2, at 3.  Dr. Krueger agreed that continued participation in a treatment program under federal supervision would have a "substantial impact upon decreasing" any risk of re-offense.  *See* Hr'g Tr., Apr. 1, 2015, at 53:11-54-12; *see also* Krueger Letter at 12.  A non-incarceratory sentence under strict supervised release conditions would allow defendant to continue benefiting from treatment opportunities while also supporting his family.

## 2.  Purposes of Sentencing

Pursuant to 18 U.S.C. § 3553(a)(2), any sentence imposed must: reflect the seriousness of the offense; promote respect for the law; provide just punishment for the offense; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2); *see also D.M.*, 942 F. Supp. 2d at 345-46.  The likelihood that defendant "will engage in future criminal conduct [is] a central factor

that district courts must assess when imposing [a] sentence." *Pepper v. United States*, 562 U.S. 476, 492 (2011); 18 U.S.C. § 3553(a)(2)(C).

R.V. pled guilty to a felony. Possession of child pornography may contribute to the existence of a market that harms and exploits children. The serious injury children are exposed to does not end with the making of child pornography; instead, it is perpetuated by the continued distribution and consumption of those images. *See D.M.*, 942 F. Supp. 2d at 344 ("Continued emotional violence is visited upon the victims of child pornography by the knowledge that their abuse is being viewed and consumed by individuals like defendant."); *see also supra* Part V.E. Yet, numerous courts, as well as the Sentencing Commission itself, have recognized that the current child pornography Guidelines do not adequately reflect the impact of the changing technological landscape on an individual's level of culpability. *See supra* Part I.A; *infra* Part VII.B.4-5. As discussed in Part V.C, *supra*, the Internet and digital media have drastically increased both the accessibility and volume of child pornography for online consumption. *See, e.g.*, U.S. Sentencing Comm'n, *Federal Child Pornography Offenses*, at 312-13. Experts have noted that easy access to child pornography materials online may "lead to sexual exploration that might otherwise have remained dormant or unstimulated." Griffin-Shelley, *supra*, at 323. The Internet revolution has enabled the creation and expansion of a subgroup of sexual offenders who are guilty of viewing child pornography, but who never have—and highly likely never will—molest a child or otherwise engage in the production or commercial distribution of child pornography. *See supra* Part V.D.

The Guidelines fail to account for this class of offenders. Several of the enhancements applicable to defendants convicted of non-production offenses, such as the two-level enhancement

for use of a computer, will almost always be applicable. This was recognized by the Second Circuit Court of Appeals in *Dorvee*, when it noted that:

> The § 2G2.2 sentencing enhancements cobbled together through this process routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases. The base offense level for distribution of child pornography, which in 1991 was 13, has been gradually increased to 22 as the Commission has attempted to square the Guidelines with Congress's various directives. On top of that, many of the § 2G2.2 enhancements apply in nearly all cases. Of all sentences under § 2G2.2 in 2009, 94.8% involved an image of a prepubescent minor (qualifying for a two-level increase pursuant to § 2G2.2(b)(2)), 97.2% involved a computer (qualifying for a two-level increase pursuant to § 2G2.2(b)(6)), 73.4% involved an image depicting sadistic or masochistic conduct or other forms of violence (qualifying for a four-level enhancement pursuant to § 2G2.2(b)(4)), and 63.1% involved 600 or more images (qualifying for a five-level enhancement pursuant to § 2G2.2(b)(7)(D)).

*Dorvee*, 616 F.3d at 186 (internal citations omitted). The Department of Justice also acknowledged that certain Guideline provisions, including the 2-level computer enhancement, do not adequately distinguish between different categories of defendants. Letter from Anne Gannon, Nat'l Coordinator for Child Exploitation & Interdiction, to Judge Patti B. Saris 1 (Mar. 5, 2013) ("Because the vast majority of child pornography offenses now involve the use of a computer, this [specific offense characteristic] should be eliminated and replaced by others . . . .").

In the present case, Dr. Krueger testified that R.V. "stumbled on" and "began viewing" child pornography about one year prior to his arrest. At the same time, R.V. began engaging in online chats with underage girls. *See* Hr'g Tr., Apr. 1, 2015, at 47:17-48:24. Dr. Krueger performed several tests to determine R.V.'s mental condition and sexual tendencies and concluded that R.V.'s risk of sexual violence and re-offense was "low" or "extremely low." Krueger Letter at 12; *see also* Hr'g Tr., Apr. 1, 2015, at 46:22-24. Dr. Krueger also determined that R.V. was not

a danger to his children. Hr'g Tr., Apr. 1, 2015, at 46:18-21. This renowned expert recommended a "non-incarceratory sentence with substantial close supervision and treatment." Hr'g Tr., Apr. 1, 2015, at 95:19-22.

R.V. has been actively engaged in treatment following his arrest. *See supra* Part II.E. A satisfactory progress report provided by Mustard Seed prior to R.V.'s sentencing concluded that:

> [R.V.] continues to attend and engage in treatment discussions. We [a]re pleased with the effort he has made thus far. We are pleased with his willingness to share as well as disclose the areas of his sexual life that may have contributed to his acting out behavior. He will begin to do work on improving his ability to recognize the thoughts, feelings and actions related to his acting out behavior. We feel the prognosis for successful treatment completion is good at this time.

R.V. Sent. Mem., Mar. 30, 2015, ECF No. 41, at Ex. E. Dr. Krueger considered R.V.'s treatment with Mustard Seed. He determined it was an "appropriate program," which "will well take care of [R.V.]" and could also assist in the "management of [R.V.'s] overall risk." Hr'g Tr., Apr. 1, 2015 at 62:19-63:15; *see also* Mustard Seed Client Compliance Report, April 1, 2015, Ct. Ex. 2, at 4 ("[W]e believe that [R.V.], if given the chance to, can benefit from community based treatment to address his involvement in the commission of a sexually deviant act.").

Given the credible medical testimony that, with appropriate treatment and supervision, R.V. does not present a risk to the public, a non-incarceratory sentence with a prolonged period of supervised release under strict conditions, including continued treatment, adequately reflects the seriousness of the offense and serves the purposes of punishment in this case. The court considered the government's request that the period of supervised release "be longer than five years; at least until the youngest child is of an age where she might be able to go to college and be out of the house." Sent. Hr'g Tr., at 36:9-14. In following the government's suggestion, the court concluded

that a supervised release period of seven years was proper. *Id.* at 37:17-18. The court also noted that "[s]upervised release should be intense with requirement of treatment at the beginning and then probation may utilize its judgment to reduce the intensity so it doesn't interfere with the family . . . ." *Id.* at 37:18-22.

In addition to the conditions of his supervised release, R.V. will be subject to prolonged and severe sex offender registration requirements under federal law and likely also under New York law. *See* 42 U.S.C. § 16913; 18 U.S.C. § 3583(k); N.Y. Correct. Law § 168-a (2)(d)(iii) (providing that the term "sex offense" includes "a conviction of . . . any of the provisions of 18 U.S.C. 2251, 18 U.S.C. 2251A, 18 U.S.C. 2252, 18 U.S.C. 2252A, 18 U.S.C. 2260, 18 U.S.C. 2422(b), 18 U.S.C. 2423, or 18 U.S.C. 2425, provided that the elements of such crime of conviction are substantially the same as those which are a part of such offense as of the date on which this subparagraph takes effect."). Such post-release conditions represent exacting collateral consequences which serve to deter future criminal conduct. *Lawrence v. Texas*, 539 U.S. 558, 575 (2003) (recognizing that the "stigma" imposed for violation of sex crime statute "is not trivial"); *United States v. Mateo*, 299 F. Supp. 2d 201, 209-10 (S.D.N.Y. 2004) ("[B]eyond the offender's actual deprivation of liberty when incarcerated, a host of other penalties and burdens always attend criminal conviction, to name a few: losses of family life, of socioeconomic status, of employment and career opportunities; diminution of certain civil rights and entitlements; and countless humiliations and indignities commonly associated with living in confinement."); Model Penal Code: Sexual Assault and Related Offenses, General Commentary at 12 (Am. Law. Inst., Discussion Draft No. 2, 2015) ("[T]he treatment of sex offenders has borne many of the hallmarks of an unjustifiably punitive state. For instance, sex offenders as a class have been subjected to

some of the most unforgiving and indiscriminate collateral consequences of conviction, such as unduly severe residency restrictions or registration requirements.").

### 3. Kinds of Sentences Available

Sentences actually imposed in similar cases have been considered, as required by § 3553(a)(3)-(4). The sentencing options available to the court include combinations of the following variables: custody followed by supervised release; probation; restitution; forfeiture; and fines. Of critical importance is also the availability of sex offender treatment.

In this case, the sentences available were as follows: an incarceratory sentence of between 78 and 97 months pursuant to the Guidelines; a term of supervised release of five years to life; a Guidelines fine range of $12,500 to $125,000; and a mandatory $100 special assessment. *See* PSR, at Part D. The court considered all available options and determined that a sentence of time-served of five days, seven years of strict supervised release with sex offender treatment, a $12,500 fine in addition to $2,000 in victim's restitution and a $100 special assessment, coupled with the continuing sex offender notification and registration requirements as provided by statute under 42 U.S.C. § 16913, amounted to appropriate punishment, for the reasons set forth herewith.

### 4. Guidelines, Policy, and Other Criteria of Sentencing Commission

The United States Sentencing Commission has voiced concerns with respect to the current Guidelines' ability to reflect varying degrees of culpability given the impact of recent technological changes on the offense of child pornography. As explained by the Second Circuit Court of Appeals in *Dorvee*, while the Guidelines are normally developed by the Commission through empirical studies focused on data about past sentencing practices, this was not the case for the child pornography offenses. Rather than being developed empirically by the Commission, these guidelines were amended at the direction of Congress. The Commission opposed

increasingly harsher penalties imposed by the legislature. *See Dorvee*, 616 F.3d at 184-86; *see also* United States Sentencing Commission, *The History of the Child Pornography Guidelines*, Oct. 2009, http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/sex offenses/20091030_History_Child_Pornography_Guidelines.pdf.

In 2012, the Commission completed a multi-year examination of "offenders sentenced under the federal sentencing guidelines and corresponding penal statutes concerning child pornography offenses." U.S. Sentencing Comm'n, *Federal Child Pornography Offenses*, at i. The Commission was especially concerned with the Guidelines applicable to non-production child pornography offenses and the extent to which they managed to meaningfully distinguish among different offenders' levels of culpability. As explained in the resulting report, "several factors" prompted the Commission's examination:

> First, during the past two decades, cases in which offenders have been sentenced under the child pornography guidelines, while only a small percentage of the overall federal criminal caseload, have grown substantially both in total numbers and as a percentage of the total caseload.
>
> Second, since the enactment of the PROTECT ACT of 2003 and *United States v. Booker*, which made the guidelines "effectively advisory" in 2005, there has been a steadily decreasing rate of sentences imposed within the applicable guidelines ranges in non-production cases . . . . *These sentencing data indicate that a growing number of courts believe that the current sentencing scheme in non-production offenses is overly severe for some offenders* . . . .
>
> Third, *as a result of recent changes in the computer and Internet technologies that non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degree of culpability.* Non-production child pornography offenses have become almost exclusively Internet-enabled crimes; the typical offender today uses modern Internet-based technologies such as peer-to-peer ("P2P") file-sharing programs that were just emerging a decade ago and now facilitate large collections of child pornography. The typical

offender's collection not only has grown in volume but also contains a wide variety of graphic sexual images (including images of very young victims), which are now readily available on the internet. As a result, four of the six sentencing enhancements in § 2G2.2—those relating to computer usage and the type and volume of images possessed by offenders, which together account for 13 offense levels—now apply to most offenders and, thus, *fail to differentiate among offenders in terms of their culpability*. These enhancements originally were promulgated in an earlier technological era, when such factors better served to distinguish among offenders. Indeed, most of the enhancements in § 2G2.2, in their current or antecedent versions, were promulgated when the typical offender obtained child pornography in printed form in the mail.

Fourth, recent social science research—by both the Commission and outside researchers—has provided new insights about child pornography offenders and offense characteristics that are relevant to sentencing policy. This research includes information regarding the prevalence of child pornography offenders' criminal sexually dangerous behavior both before their arrests and after their ultimate reentry into the community following their convictions, as well as *emerging research on the efficacy of psycho-sexual treatment of offenders' clinical sexual disorders*.

Finally, most stakeholders in the federal criminal justice system consider the nonproduction child pornography sentencing scheme to be seriously outmoded. Those stakeholders, including sentencing courts, increasingly feel that they "are left without a meaningful baseline from which they can apply sentencing principles" in non-production cases.

*Id.* at i–ii (emphasis added).

While observing that "[a]ll child pornography offenses are extremely serious because they both perpetuate harm to victims and normalize and validate the sexual exploitation of children," the Commission concluded that "revisions are needed to more fully differentiate among offenders based on their culpability and sexual dangerousness." *Id.* at 311.

Recommended by the Commission was that "the non-production child pornography sentencing scheme should be revised to account for recent technological changes in offense

conduct and emerging social science research about offenders' behaviors and histories, and also to better promote the purposes of punishment by account for the variations in offenders' culpability and sexual dangerousness." *Id*. at xvii. It also recommended that Congress "amend the statutory scheme to align the penalties for receipt and possession offenses." The distinction between the conduct, according to the Commission's review of over 2,000 non-production cases, was "indistinguishable." *Id*. at xix, xx.

A below-Guidelines sentence for a first time non-production offender which takes into account the changing technological landscape's impact and his family's needs is consistent with concerns expressed by the Sentencing Commission.

### 5. Unwarranted Sentence Disparities

#### a. Increased below-Guidelines sentences in non-production cases

18 U.S.C. § 3553(a)(6) requires an analysis of comparable sentences. While courts have sometimes imposed sentences within and above the applicable Guideline ranges in child pornography cases, disagreement with the current sentencing scheme has convinced an increasing number of judges to impose sentences below those recommended by the Guidelines in non-production cases. *See, e.g.*, *D.M.*, 942 F. Supp. 2d at 347-48 ("While it is not difficult to find cases where severe sentences within and above the Guidelines have been imposed, there is by no means a paucity of cases where judges downwardly depart from the Guidelines. The unreasonable harshness of the Guidelines for an offense of child pornography possession, of which defendant is charged, has been recognized by courts and judges from across the country.").

As illustrated by the following table, a recent survey by the Sentencing Commission demonstrated that about seventy percent of federal judges considered the Guidelines for child pornography possession and receipt too severe.

# III. Guideline Application

## Question 8. Appropriateness of Guideline Ranges

**Table 8. Is the guideline range generally appropriate for each following type of offense?**

| | Yes | No—Too Low | No—Too High | Total | Number | N/A | Missing |
|---|---|---|---|---|---|---|---|
| | | Percent | | | | | |
| Murder | 89% | 9% | 2% | 100% | 143 | 474 | 22 |
| Manslaughter | 78 | 21 | 1 | 100% | 107 | 504 | 28 |
| Assault | 83 | 12 | 5 | 100% | 282 | 330 | 27 |
| Fraud | 65 | 24 | 10 | 100% | 594 | 20 | 25 |
| Larceny/Theft/Embezzlement | 70 | 21 | 9 | 100% | 570 | 47 | 22 |
| Drug Trafficking | | | | | | | |
| *Heroin* | 65 | 3 | 32 | 100% | 475 | 150 | 14 |
| *Powder Cocaine* | 65 | 6 | 30 | 100% | 599 | 26 | 14 |
| *Crack Cocaine* | 28 | 2 | 70 | 100% | 592 | 34 | 13 |
| *Methamphetamine* | 60 | 6 | 34 | 100% | 539 | 84 | 16 |
| *Marijuana* | 54 | 5 | 41 | 100% | 553 | 72 | 14 |
| *Ecstasy* | 65 | 4 | 30 | 100% | 430 | 193 | 16 |
| *Oxycodone* | 64 | 6 | 29 | 100% | 384 | 235 | 20 |
| Child Pornography | | | | | | | |
| *Production* | 72 | 13 | 16 | 100% | 450 | 173 | 16 |
| *Distribution* | 62 | 8 | 30 | 100% | 530 | 93 | 16 |
| *Receipt* | 28 | 3 | 69 | 100% | 570 | 72 | 14 |
| *Possession* | 26 | 3 | 70 | 100% | 576 | 46 | 17 |
| Other Child Exploitation Offenses | 72 | 12 | 16 | 100% | 348 | 258 | 33 |
| Firearms | 70 | 7 | 23 | 100% | 591 | 29 | 19 |
| Alien Smuggling | 67 | 21 | 12 | 100% | 395 | 225 | 19 |
| Illegal Reentry into the U.S. | 55 | 11 | 34 | 100% | 592 | 32 | 15 |

Note. "Number" refers to respondents who answered question with other than a "N/A response." "N/A", or "not applicable," means that respondent had not sentenced a defendant convicted post-Kimbrough/Gall. "Missing" means that respondent did not provide any information about this question. Percents may not sum to 100% due to rounding.

U.S. Sentencing Comm'n, *Results of Survey of United States District Judges January 2010 through March 2010* (June 2010), at 13.

A subsequent report by the Sentencing Commission recorded an increasing trend in sentencing below the Guidelines range for non-production cases:

> A variety of stakeholders in the federal criminal justice system, including the Department of Justice, the defense bar, and many in the federal judiciary, are critical of the current non-production

86

penalty scheme. Although these stakeholders are not unanimous concerning the perceived flaws in the penalty scheme, many believe that it fails to adequately differentiate among offenders based on their culpability and sexual dangerousness, needs to be updated to reflect recent changes in typical offense conduct associated with the evolution of computer and Internet technologies, and is too severe for some offenders. As a result, courts and parties increasingly have engaged in charging and sentencing practices that have limited many offenders' sentencing exposure.

U.S. Sentencing Comm'n, *Federal Child Pornography Offenses*, at xii; *see also id*. at 165 ("The rate of non-production cases in which sentences were imposed within the applicable guideline range steadily fell from its high point in fiscal year 2004, at 83.2 percent of cases, to 40.0 percent of cases in fiscal year 2010, and to 32.7 percent of cases in fiscal year 2011.").

A strong judge-initiated trend of departing downward for defendants in child pornography offenses has emerged in recent years:



**Judicial Downward Departure Odds (Compared to Property Offenses) for Male Offenders, Offense Categories (N = 192,443)**

* Significant at .001

Jeffrey T. Ulmer, *Mismatch of Guidelines and Offender Danger and Blameworthiness Departures as Policy Signals from the Courts*, 13 Criminology & Pub. Pol'y 271, 275 (2014).

In departing downward, district judges nationwide have spoken out against the harsh Guidelines sentences for child pornography offenders. *See, e.g.*, *United States v. Kelly*, 868 F. Supp. 2d 1202, 1211 (D.N.M. 2012) (defendant received and downloaded 580 images of child pornography; "[Defendant]'s advisory Guideline sentence of 87 to 108 months imprisonment is far greater than necessary to punish and deter his conduct and protect the public. This is largely due to serious flaws in U.S.S.G. § 2G2.2, which was not drafted pursuant to the Sentencing

Commission's usual expertise, and all too frequently generates unjustly excessive terms of incarceration."); *United States v. Marshall*, 870 F. Supp. 2d 489, 491-92 (N.D. Ohio 2012) ("Under the Guidelines, some of the recommended sentences for viewers can, with enhancements, be higher than those for actual predators . . . . In effect, the Guidelines presume that those who view child pornography are indistinguishable from those who actually abuse children."); *United States v. Stark*, No. 10-CR-270, 2011 WL 555437,  at *7 (D. Neb. Feb. 8, 2011) (defendant downloaded over 100 image files, and had multiple hard drives containing over 2,000 images, 5,000 videos, and 650,000 images of child erotica; "[T]he child pornography Guidelines are driven by Congressional directive and are not grounded in any scientific, statistical, or empirical method . . . . Although downloading child pornography is hardly a harmless activity, it is not the equivalent of direct physical abuse or sexual molestation of children, or production of pornography involving children.  The court finds that the ranges of imprisonment recommended under the Guidelines may be appropriate for a sexual predator, but are not a reliable appraisal of a fair sentence in this case."); *United States v. Price*, No. 09-CR-30107, 2012 WL 966971, at *12 (C.D. Ill. Mar. 21, 2012) (images of defendant's daughter along with 937 still images and 21 videos of other children alleged to be child pornography where found on defendant's computer; "[C]hild pornography crimes fall within a spectrum . . . . This Court finds that a below-Guideline sentence is needed in this case in order to avoid unwarranted sentencing disparities but also to avoid unwarranted sentencing similarities among defendants convicted of dissimilar conduct."); *United States v. Cameron*, No. 09-CR-00024, 2011 WL890502, at *4 (D. Me. Mar. 11, 2011) ("[Defendant] is subject to nearly a ten-fold greater punishment for possessing images of someone else sexually abusing a minor than he would receive if he had committed the actual abuse himself."); *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1105 (N.D. Iowa 2009) (defendant pled guilty to knowingly transporting,

receiving, and possessing child pornography across state lines, in total 2,600 images of potentially 370 different victims; "This guideline, thus, blurs logical differences between least and worst offenders, contrary to the goal of producing a sentence no greater than necessary to provide just punishment . . . . The sentencing court must consider the need to avoid *unwarranted similarities* among defendants who are *not* similarly situated, as well as *unwarranted disparities* among defendants who *are* similarly situated."); *United States v. Cruikshank*, 667 F. Supp. 2d 697, 702 (S.D. W. Va. 2009) (defendant convicted of possessing or knowingly accessing with intent to view child pornography; "There is nothing redeeming or even understandable about this crime.  But judges must objectively consider whether the sentences imposed further the goals of punishment. To do so, we must differentiate between those who create child pornography and those who consume it . . . . In an instance of troubling irony, an individual who, sitting alone, obtained images of sexually exploited children on his computer, could receive a higher sentence than the Guidelines would recommend for an offender who actually rapes a child."); *United States v. Burns*, No. 07-CR-556, 2009 WL 3617448, at *7-8 (N.D. Ill. Oct. 27, 2009) (defendant was convicted on two counts of receiving and distributing child pornography with a "relatively small collection of illegal images"; sentenced to 72 months, below Guidelines' range of 235-293 months); *United States v. Meysenburg*, No. 08-CR-361, 2009 WL 2948554, at *8 (D. Neb. Sept. 11, 2009) ("Possession of pornography is the least serious of the crimes on the continuum of conduct—from possession to distribution to production to predatory abuse—that exploit children.  One who possesses child pornography is considerably less culpable than one who produces or distributes the exploitative materials and a possessor is a marginal player in the overall child exploitation scheme."); *United States v. Johnson*, 588 F. Supp. 2d 997, 1004-07 (S.D. Iowa 2008) (refusing to "give too much weight to the sentencing guidelines, given their lack of empirical support" and finding that a

sentence well below the Guidelines range was warranted); *United States v. Grober*, 595 F. Supp. 2d 382, 393 (D.N.J. 2008), *aff'd*, 624 F.3d 592 (3d Cir. 2010) (defendant convicted of downloading 1500 images and 200 videos of child pornography; "§ 2G2.2 leads to a sentence that is too severe in a downloading case.  Surely congress did not intend to provide a sentencing range of 19 ½ to 20 years for a typical downloader, especially one who pleads guilty.  Aside from overly punitive sanctions for a first offender, the guidelines sentence for a typical downloader squelches the ability of a judge to depart upward. The bottom line is that the skewed focus in § 2G2.2 on content and the strained application to conduct . . . lead to a vision whereby the predator becomes indistinguishable from the voyeur.").

### b.  Increased non-prison sentences in possession-only cases

Courts have noted the comparatively lower culpability of defendants convicted of possessing child pornography (as opposed to distribution, production and actual sexual abuse). With respect to defendants convicted only of possession offenses, some courts have imposed sentences with minimal or no incarceration.  *See, e.g.*, *D.M.*, 942 F. Supp. 2d at 352; *United States v. Autery*, 555 F.3d 864, 867 (9th Cir. 2009) (affirming non-Guidelines sentence of five years of probation and no period of incarceration for possession of child pornography); *United States v. Stall*, 581 F.3d 276, 277-78 (6th Cir. 2009) (affirming non-Guidelines sentence of one day of incarceration followed by ten-year period of supervised release); *United States v. Prisel*, 316 F. App'x 377, 378 (6th Cir. 2008) (affirming non-Guidelines sentence of one day in prison followed by eighteen months of home confinement for possession of child pornography); *United States v. Rowan*, 530 F.3d 379, 380 (5th Cir. 2008) (affirming non-Guidelines sentence of five years of probation and no period of incarceration for possession of child pornography); *United States v. Polito*, 215 F. App'x 354, 355 (5th Cir. 2007) (per curiam) (affirming non-Guidelines sentence of

five years of probation with one year of house arrest for possession of child pornography); *United States v. Crespo-Rios*, No. 08-CR-208, 2015 WL 6394256, *1 (D.P.R., Oct. 19, 2015) (holding "that resentencing Defendant to the same sentence—that is, time served followed by a long period of supervised release—is justified in view of each of the sentencing factors outlined in 18 U.S.C. § 3553"); *United States v. Mallatt*, No. 13-CR-3005, 2013 WL 6196946, at *13 (D. Neb. Nov. 27, 2013) ("sentence of time served, followed by six years of supervision with special conditions including intensive treatment is adequate to fulfill the goals of sentencing in this case"); *United States v. Diaz*, 720 F. Supp. 2d 1039, 1048 (E.D. Wis. 2010) (imposing non-Guidelines sentence of six months of incarceration followed by twelve years' supervised release); *United States v. Meillier*, 650 F. Supp. 2d 887, 887 (D. Minn. 2009) (imposing non-Guidelines sentence of one day of confinement followed by thirty years of supervised release); *United States v. Boyden*, No. 06-CR-20243, 2007 WL 1725402, at *10 (E.D. Mich. June 14, 2007) (imposing non-Guidelines sentence of one day of confinement followed by three years of supervised release, the first year of which to be served in a community correctional facility); Judgment in a Criminal Case, *United States v. Evren*, No. 10-CR-131 (E.D.N.Y. Feb. 26, 2013) (ECF No. 59) (imposing non-Guidelines sentence of three years of probation for defendant who pleaded guilty to one count of possession of child pornography); *see also United States v. Morace*, 594 F.3d 340, 351 n. 10 (4th Cir. 2010) (noting "that some district courts have begun sentencing defendants convicted of possessing child pornography to one day of incarceration followed by a term of supervised release").

### 6. Restitution

In this case one victim known as "Vicky" has made a restitution request. One video of the victim was found on defendant's digital media. Letter re Sentencing as to [R.V.], Mar. 25, 2015, ECF No. 40 (sealed), at 7. Attorneys for "Vicky" submitted a restitution request, as well as Victim

Impact Statements dated December 2011, January 2013 and September 2013. The restitution request details "Vicky's" continuing psychological injury stemming from the ongoing proliferation of images showing the severe abuse she was subjected to as a child. *Id*. at 7-8.

Following *Paroline*, the government suggested that the court start by "determin[ing] the amount of the victim's losses caused by the continuing traffic in the victim's images." *Id*. at 8 (internal quotation marks omitted). The government noted that "Vicky" estimated her current losses at $1,085,718.09, of which she had received $678,094.61 in restitution payments. Of "Vicky's" total losses $407,623.48 had yet to be fulfilled through restitution. *Id*.

The government analyzed the *Paroline* factors and determined that a payment of $2,000 amounted to proper restitution in this case. *Id*. at 8-10 ("Notably, if one divides 'Vicky's' total loss estimate by the number of defendants with standing restitution orders involving 'Vicky,' plus the instant defendant . . . the result is $2,162 per defendant ($1,085,718.09 divided by 502).") (footnote omitted). Defendant did not object. Sent. Hr'g at 24:6-8. Since the government's assessment is in accord with the Supreme Court's decision in *Paroline*, this court ordered R.V. to pay $2,000 in restitution, payable at $100 a month to the Clerk of the Court. Sent. Hr'g at 24:9-11, 19:20.

### C. Policy Considerations

Child pornography is an issue that implicates deep religious beliefs, ethical considerations, complex conceptions of sexuality—its joys and problems—evolving notions of freedom of speech, and concerns about privacy. Our society is deeply divided on how to address child pornography. *See* Daniel Beekman, *Appeals Court Reverses Light Sentence Given to Queens Child Porn Perv and Molester*, N.Y. Daily News, Sept. 27, 2013, http://www.nydailynews.com/news/crime/court-reverses-sentence-quns-perv-article-1.1468359; Lauren Garrison, *Child Porn Cases Trigger New*

93

*Debate: Judges Lack Discretion with Mandatory Sentencing*, New Haven Register, Aug, 15, 2010, http://www.nhregister.com/article/NH/20100815/NEWS/ 308159971; A.G. Sulzberger, *Defiant Judge Takes on Child Pornography Law*, N.Y. Times, May 22, 2010, at A1 ("There is little public sympathy for collectors of child pornography.").

Strong interest in child pornography as an American legislative problem emerged in the late 1970s. In response to growing public concern, Congress enacted the Protection of Children Against Sexual Exploitation Act of 1977. Pub. L. No. 95-225, 92 Stat. 7 (1978) (codified as amended at 18 U.S.C. §§ 2251-52, 2256 (2006)). With each passing decade, Congress has increased criminal sanctions, casting a wider and finer net. *See* U.S. Sentencing Comm'n, *The History of the Child Pornography Guidelines* (2009) at 6-9; Carol S. Streiker, *Lessons from Two Failures: Sentencing for Cocaine and Child Pornography under the Federal Sentencing Guidelines in the United States*, 76 Law & Contemp. Probs. 27, 37 (2013) ("From the inception of the Guidelines in 1987, the treatment of child pornography has been a one-way ratchet, repeatedly turned by Congress."); *see also* Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587 (2006) (codified as 42 U.S.C. § 16911 (2006)); PROTECT Act of 2003, Pub. L. No. 108-21, 117 Stat. 650 (2003); Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009. According to one scholar, the "punitive stance" of Congress stems from noting "moral panic about sexual exploitation of children." Hamilton, *supra*, at 547.

The Sentencing Commission has repeatedly requested that Congress review sentencing for child pornography cases, particularly the imposition of mandatory minimums. *See* U.S. Sentencing Comm'n, *Federal Child Pornography Offenses*, at 320-31; U.S. Sentencing Comm'n, *The History of the Child Pornography Guidelines*. Yet, Congress has not acted. For a congressperson, addressing child pornography is akin to stepping onto the third rail. The net result

of congressional inaction has been that inconsistent and long sentences that destroy not only the individual but the family and community have sometimes been ordered.

Across the country, an increasing number of federal judges have criticized changes to sentencing laws that have effectively quadrupled defendants' average prison term over the last decade. *See, e.g.*, *United States v. Grober*, 624 F.3d 592, 603-04 (3d Cir. 2010); *see also supra* Part VII.B.5. The Court of Appeals for the Second Circuit has recognized the dearth of data on critical issues affecting risks, dangers, and appropriate sentences in these cases. *See, e.g.*, *Dorvee*, 604 F.3d at 94 (finding error in sentencing court's "apparent assumption" about link between possession of child pornography and risk of acting out); *United States v. Falso*, 544 F.3d 110, 122 (2d Cir. 2008) (finding error in district court's reliance on defendant's history of sexual abuse of minor and "general proclivities" of child pornographers in finding probable cause to issue a search warrant in child pornography investigation); *see also United States v. Stern*, 590 F. Supp. 2d 945 (N.D. Ohio 2008) (recognizing the difference in culpability between viewing and producing child pornography as well as the wide variation of sentences in child pornography cases).

As explained above in Part VII.B.4, Section 2G2.2 of the Sentencing Guidelines is "a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *Dorvee*, 616 F.3d at 184. Following its holding in *Dorvee*, the Court of Appeals for the Second Circuit has consistently held that district courts are permitted to consider a broad, policy-based challenge to child pornography sentencing guidelines in downwardly departing. *See, e.g.*, *United States v. Alhakk*, 505 F. App'x 51, 55 (2d Cir. 2012) ("[T]he court noted that it had given 'special consideration' to the concerns expressed in *Dorvee* . . . . Based on all of these considerations, the court concluded that a below-Guidelines sentence . . . was sufficient but not greater than necessary

to fulfill the requirements of § 3553(a)."); *United States v. Chow*, 441 F. App'x 44, 45 (2d Cir. 2011) ("*Dorvee* recognizes district courts' post-*Booker* authority to 'vary from the Guidelines range based solely on a policy disagreement with the Guidelines,' and encourages courts to take seriously that discretion 'in fashioning sentences under § 2G2.2' for child pornography defendants."); *United States v. Tutty*, 612 F.3d 128, 133 (2d Cir. 2010) (defendant possessed between 150 and 300 digital images of child pornography and he received and distributed these images using a file sharing program; "[T]he district court should . . . bear in mind that the 'eccentric' child pornography Guidelines, with their 'highly unusual provenance,' 'can easily generate unreasonable results' if they are not 'carefully applied.'") (citing *Dorvee*, 604 F.3d at 98).

Other circuits have also declared that "district courts may vary from the child pornography guidelines . . . based on policy disagreement with them, and not simply based on individualized determination that they yield an excessive sentence in a particular case." *U.S. v. Henderson*, 649 F.3d 955, 963 (9th Cir. 2011).

The United States Department of Justice has expressed concern with the current Guidelines' failure to afford proper punishment for child pornography offenses and has requested the Sentencing Commission to revise the Guidelines, writing: "the evolution of the child pornography 'market' ha[s] led to a significantly changed landscape—one that is no longer adequately represented by the existing sentencing guidelines." Letter from Anne Gannon, Nat'l Coordinator for Child Exploitation & Interdiction, to Judge Patti B. Saris 1 (Mar. 5, 2013).

"Rationales for child pornography Guidelines for non-production offenses have been shredded." *D.M.*, 942 F. Supp. 2d at 352. A below-Guidelines sentence in the instant case is supported by concerns expressed by federal appellate courts and district courts, as well as the Sentencing Commission and the United States Department of Justice. It is recognized that the

child pornography Guidelines are "fundamentally different from most and . . . , unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *Dorvee*, 616 F.3d at 184. Acceptance of this fact enhances a sentencing court's ability to properly comply with its duty to impose sentences that reflect the statutory goals of sentencing and are based on a required individualized assessment of the facts presented.

## VIII.        Conclusion

A non-incarceratory sentence with a period of seven years of strict supervised release and treatment is appropriate in this case. Given the individual characteristics of this defendant and his family, the sentence strikes an appropriate balance between general and specific deterrence concerns and the need for rehabilitation.

Removing R.V. from his family will not further the interests of justice; it will cause serious harm to his young children by depriving them of a loving father and role model, and will strip R.V. of the opportunity to heal through continued sustained treatment and the support of his close family.

Defendant has been deemed to pose little or no risk to society. The probation department is directed to closely supervise him to ensure that the public is protected. R.V.'s conditions of release may be altered in case of any deviation from his present wholesome life.


SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: January 21, 2016
      Brooklyn, New York